El Pueblo de Puerto Rico, apelado, *v.* Rafael Moreno Morales, acusado y apelante.

*Número:* CR-88-69          *Resuelto:* 21 de diciembre de 1992

*Carlos Ortiz Santiago* y *Olga Birriel Cardona,* abogados del apelante; *Alejandro Salgado Rivera, Fiscal Especial Independiente,* abogado de El Pueblo.

El Juez Asociado Señor Negrón García emitio la opinión del Tribunal.

I

El Fiscal Especial Independiente (F.E.I.) acusó, entre otros, a Rafael Moreno Morales de dos (2) cargos de asesinato en primer grado consistentes en haber dado muerte a Arnaldo Darío Rosado y Carlos Soto Arriví el 25 de julio de 1978 en el Cerro Maravilla. El proceso en el Tribunal Superior, Sala de San Juan (Hon. Luis R. Cruz Jiménez, Juez), se celebró durante el período comprendido entre el 12 de enero y el 18 de marzo de 1988.([1]) Desfilar la prueba

---

([1]) Los coacusados Nelson González Cruz, Juan Bruno González, Nazario Mateo Espada, Jaime Quiles Hernández y Rafael Torres Marrero hicieron alegación de

tomó cuarenta y cuatro (44) días laborables; prestaron testimonio cuarenta y dos (42) testigos.

Un Jurado rindió veredicto de culpabilidad por el asesinato en segundo grado de Soto Arriví. Moreno Morales solicitó nuevo juicio y el tribunal rechazó su pedido. El 23 de junio de 1988 lo sentenció a cumplir de veintidós (22) a treinta (30) años de presidio, en virtud del régimen de sentencias indeterminadas a cumplirse en forma consecutiva con cualquier otra sentencia que estuviera cumpliendo. Apeló.

De los diecisiete (17) señalamientos de error, sólo discutiremos aquellos en que Moreno Morales nos ha puesto en condiciones de evaluar. *Pueblo v. Barreto González,* 107 D.P.R. 536, 539 (1978). De los restantes, uno fue desistido y los otros versan sobre alegados hechos o incidentes no cubiertos en la Exposición Narrativa de la Prueba, según estipulada, que consta de trescientas veinticuatro (324) páginas.([2]) Aunque a Temis, la dama de la justicia, se le

---

culpabilidad en los dos (2) cargos de asesinato en segundo grado y en los de perjurio. William Colón Martínez aceptó culpabilidad por el delito de conspiración para cometer asesinato y por dos (2) casos de perjurio. Ángel L. Pérez Casillas fue absuelto por el Jurado.

([2]) En consecuencia, no examinaremos los siguientes:

"a) Erró el Tribunal al no permitir la recusación motivada por la defensa de varios miembros del jurado. [Desistido.]

"b) Erró el Tribunal al actuar con prejuicio y parcialidad en contra del acusado desde el comienzo de la desinsaculación del jurado hasta el mismo instante que dictó la sentencia, violentándosele al acusado apelante el derecho constitucional de su derecho a la presunción de inocencia y a tener un juicio justo e imparcial.

"c) Erró el Tribunal al violentarle el derecho del acusado apelante a confrontarse adecuadamente con los testigos de cargo. Esto es, resolvió incorrectamente la aplicación de la Regla 47 y la 63 de las de Evidencia limitando de este modo el contrainterrogatorio a los testigos de cargo.

"d) El Ministerio Público incurrió en conducta impropia en presencia del jurado lo que fue sumamente perjudicial al acusado apelante.

"e) El Tribunal erró al llamarle constantemente la atención a la defensa del acusado apelante en presencia del jurado, llegando al extremo de decirle al Lcdo. Carlos Ortiz Santiago, entre otras cosas, que era poco profesional, que le estaba faltando el respeto al jurado y que no tenía un concepto claro de lo que era un juicio justo e imparcial. Esta actuación del Tribunal le fue sumamente perjudicial al acusado apelante, máxime, cuando no existe prueba alguna de que la defensa de éste le faltara el respeto a las damas y caballeros del jurado que intervino en el juicio.

representa modernamente con una balanza y una venda en los ojos, ello no significa que podemos adjudicar a ciegas: para juzgar justiciera y equitativamente hay que conocer los hechos pertinentes, los actores principales, la trama y los incidentes de este trágico drama. En buena técnica adjudicativa, para facilitar el análisis y lograr una mejor comprensión de nuestra razón de decidir (*ratio decidendi*), hemos dividido la exposición fáctica en dos (2) etapas cronológicas. Expongámoslas.

## II

*1ro de julio al 24 de julio de 1978.*

Para julio de 1978, la División de Inteligencia de la Policía de Puerto Rico (División de Inteligencia) la dirigía el Comandante Ángel L. Pérez Casillas. Allí se desempeñaban, entre otros, los agentes Jaime Quiles, Carmelo Cruz, Antonio Méndez, *el apelante Moreno Morales*, el Sgto. Nel-

---

"f) Erró el Tribunal al permitir prueba acumulativa innecesariamente dándole de este modo más importancia a unos hechos en particular que a otros.

"g) Erró el Tribunal al permitir evidencia inflamatoria de fotografías repetidas.

"h) Erró el Tribunal al permitir fotografías de los occisos y de partes de los cuerpos de éstos que era prueba acumulativa, permitiendo además, repetir innecesariamente esa evidencia cuando el Fiscal la proyectaba en tamaño considerable en la pared del Tribunal.

"i) Erró el Tribunal al no permitir que el jurado escuchara, cuando así lo solicitó, la totalidad de los testimonios grabados de los testigos Carmelo Cruz y Antonio Méndez en relación a reuniones que éstos llevaron a cabo con el exagente Alejandro González Malavé en el estacionamiento de Sears que queda en las cercanías del Centro Judicial de San Juan.

"j) Erró el Tribunal al leerle al jurado el resumen de la teoría del Fiscal, máxime, cuando el resumen leído por el Honorable Juez contenía prueba que el Ministerio Público prometió, anunció y no presentó u ofreció durante el juicio.

"k) Erró el Tribunal al referirse en el resumen de la prueba, a los occisos Arnaldo Darío Rosado y Carlos Soto Arriví como que éstos fueron asesinados por el acusado apelante.

"l) Erró el Tribunal al leerle al jurado, después del resumen de la prueba y cuando correspondía dar las instrucciones, el historial del caso que comprendía, entre otras cosas, la fecha de los hechos; las fechas en que otros magistrados determinaron causa probable para arrestar y para acusar; y las fechas [en] que el acusado apelante solicitó y obtuvo suspensiones." Escrito de apelación, págs. 1–3.

son González, William Colón, Juan Bruno González, Jorge Hernández Colón, José Antonio Colón, Rafael Torres Marrero y José Manuel Montañez. E.N.P., págs. 102–105. Los agentes Miguel Cartagena Flores, Nazario Mateo Espada y Carlos Santiago Borrero trabajaban en la Oficina de Inteligencia de Ponce. E.N.P., pág. 6. A través de sus agentes encubiertos y confidentes, la División de Inteligencia recibía información sobre personas que alegadamente militaban en grupos que atentaban contra la seguridad o estabilidad del país. Esas personas eran investigadas y se les abría un expediente. E.N.P., pág. 105. Alejandro González Malavé, uno de los agentes encubiertos, para julio de 1978 se había infiltrado en el grupo denominado "Movimiento Revolucionario Armado" (M.R.A.), compuesto por Darío Rosado, Soto Arriví, Ramón Rosado y Erich Rodríguez. E.N.P., pág. 20.

El 1ro de julio el Sgto. Miguel A. Vázquez, de la División de Inteligencia, informó al Comandante del Área de Ponce, y éste a su vez al Distrito de Jayuya, que alertara el personal porque Saunders y Figueroa planeaban traer armas de Santo Domingo y utilizarlas el 4 de julio. Se indicó que andaban en un auto Volkswagen color amarillo, de 1973. Así se hizo. E.N.P., pág. 78. Para el 2 de julio, el agente Hernández Colón había investigado y verificado que la confidencia era falsa. Ese mismo día redactó y dirigió un informe al Comandante Pérez Casillas y personalmente lo informó al Sgto. Nelson González. E.N.P., págs. 89–90 y 95.

El 3 de julio, el Tte. Roberto Santiago, Director de Inteligencia del Área de Ponce, informó al Distrito de Jayuya que un Volkswagen amarillo de 1973, con otro color en el guardalodo, parte posterior, "se proponen destruir las torres de Maravilla" y otras, que andan armados y saben bregar con explosivos, y que son peligrosos. Instruyó "detener[los y] registrarlos". La información se transmitió a todo el personal policiaco de Jayuya. E.N.P., pág. 81. En virtud de esta información, durante los días 1 y 3 de julio,

los agentes Santiago Borrero, Ramón Rodríguez y otros prestaron vigilancia en el área del Cerro Maravilla.

Pérez Casillas, Quiles y Cruz sabían del M.R.A. y el contenido de los informes de González Malavé. E.N.P., págs. 19–20. Para esa época, Darío Rosado, Soto Arriví, Figueroa y Saunders tenían carpetas abiertas por Montañez a petición de Pérez Casillas. E.N.P., pág. 106.

El 5 de julio, González Malavé informó que el M.R.A. planeaba, entre otros actos, quemar unas antenas transmisoras del F.B.I. en Jayuya. El 10 de julio comunicó que Darío Rosado tenía planes de quemar unas torres propiedad del Gobierno federal en el área de Toro Negro. El 18 de julio volvió a informar sobre el plan de ir a Toro Negro. Pérez Casillas y Quiles le instruyeron que continuara con ese plan.

El 19 de julio, José A. Colón Ortiz, fotógrafo de la División de Inteligencia, trató, pero no pudo tomar por las condiciones del tiempo, unas fotos aéreas desde un helicóptero del área de Toro Negro. E.N.P., págs. 71–72. El 20 de julio, junto al Teniente Quiles logró tomar fotos de todas las torres del área y del Yunque. E.N.P., págs. 72–76.

El 20 de julio, sin mediar solicitud, González Malavé recibió un revólver calibre 38 de Cruz por instrucciones de Pérez Casillas y de Quiles. E.N.P., pág. 23. El 21 de julio, González Malavé informó que el grupo M.R.A. planeaba hacer un viaje de observación a las torres de Toro Negro el 23 del corriente. Al otro día rindió un informe más detallado. E.N.P., pág. 21.

En la madrugada del 23 de julio fueron a Toro Negro, Pérez Casillas, Quiles, Montañez, Cruz, Colón Ortiz y Torres Marrero. Allí, Pérez Casillas impartió instrucciones de vigilar y corroborar si llegaban unos individuos a reconocer el área. Montañez se ubicó entre la vegetación de la Torre de la Policía. Las personas no llegaron y Pérez Casillas levantó la vigilancia. E.N.P., págs. 27 y 107–109.

Ese día, Pérez Casillas fue a la Torre de la Policía y le

preguntó al policía Jesús Quiñones Quiñones, adscrito al Cuartel de Villalba, a quién pertenecían las edificaciones del lugar. Luego abandonaron el lugar. Poco después llegó otro vehículo con el teniente Quiles y el agente Montañez; le indicaron a Quiñones Quiñones que estaban verificando las condiciones del lugar, pues pensaban llevar a cabo una especie de adiestramiento en esa área. E.N.P., págs. 181–182.

Subsiguientemente, en horas de la tarde, en reunión en el Cuartel de Distrito de Jayuya con el personal de Inteligencia de San Juan, se les informó a los policías uniformados que tenían una confidencia de unas personas que iban a ir a las torres —no se sabía si era Puntita o Maravilla— que los que estuvieran allá arriba no deberían intervenir, pues ellos lo harían. E.N.P., págs. 64–65 y 67.

El 23 de julio González Malavé comunicó que planeaban ir el 24 a Toro Negro. E.N.P., pág. 21.

El 24 de julio acaecieron varios incidentes significativos. En la mañana, el teniente Quiles solicitó al policía Aníbal González Rodríguez, examinador de armas de fuego, que alterara unos cartuchos de escopeta calibre 12, sacando y sustituyendo las municiones por algodón o papel de relleno. Le informó que era para un agente encubierto a usarse en un operativo. Cuando González Rodríguez le dijo que no podía hacerlo sin que se notara la alteración, Quiles le indicó: "bueno, pues déjalo así, que se fastidie, se joda el encubierto si hay que joderlo." E.N.P., pág. 98. Cabe señalar que González Malavé tenía una escopeta recortada en su casa. E.N.P., pág. 31.

Ese mismo 24 de julio, al *mediodía*, se trasladaron hacia Toro Negro un grupo de agentes de la División de Inteligencia (Pérez Casillas, Quiles, Montañez, *el apelante Moreno Morales*, Nelson González, Bruno, Colón Berríos, Ríos, Erazo, Nazario y Torres Marrero) junto con Julio César Andrades, José Ríos Polanco, Luis Reverón, Rivera Falú y otros más de la División de Arrestos Especiales del

N.I.C. Llevaban chalecos a prueba de balas, armas largas y sus armas de reglamento. E.N.P., págs. 110, 112 y 137. Se reunieron en el estacionamiento del Cerro Puntita. Allí Pérez Casillas impartió instrucciones para proteger las torres. Indicó que vendrían unos individuos sumamente peligrosos, "dos terroristas acompañados de un agente encubierto", que pernoctarían en el lugar para el día siguiente llevar a cabo un atentado terrorista contra las instalaciones de algunas de las torres de comunicaciones, y que de llegar allí, se les arrestaría. El *apelante Moreno Morales estuvo en esa reunión.* El personal se distribuyó en diferentes puntos. E.N.P., págs. 112 y 137.

Esa tarde, cuando el guardia Rivera Cintrón llegó al Cerro Puntita, unos agentes de inteligencia le indicaron que esperaban unos subversivos que vendrían con un agente encubierto para destruir lo que había en las torres, que no sabían si en Puntita o en Maravilla y que había otros agentes en Maravilla. Si alguien subía debía meterse en la caseta, pues estaba uniformado y ellos intervendrían. A preguntas de Rivera Cintrón le informaron que si surgía un tiroteo "el encubierto va a disparar primero, para nosotros saber que ese es el policía". E.N.P., págs. 66, 67 y 68.

Así las cosas, varios agentes, con armas largas, chalecos a prueba de balas, radios transmisores y binoculares, llegaron a la Torre de la Policía. Se mantuvieron separados del guardia Quiñones Quiñones, excepto para preguntarle dónde comer y pedirle prestado un chaleco que él les negó. E.N.P., págs. 181–182.

Transcurrieron las horas. En la madrugada de 25 de julio González Malavé llamó e indicó a Cruz que quería verlo. En el estacionamiento de Sears le informó a Cruz y a Quiles que el plan se había reinstalado e irían a Ponce, tomarían un rehén, le quitarían el vehículo y se dirigirían a las torres. Fue instruido en que debía proteger al rehén y, si ocurría un ataque contra el grupo, gritara que era policía. Quiles le indicó que en el área había personal cua-

lificado para protegerlo y que Torres Marrero lo iba a identificar como agente para que no le hicieran daño.[3] Además de González Malavé, irían Darío Rosado, Soto Arriví y Ramón Rosado. Se reunirían frente a la Universidad de Puerto Rico. E.N.P., págs. 22 y 24.

Temprano en la mañana del 25, Cruz y Méndez salieron hacia Río Piedras para vigilar a los jóvenes. El primero en llegar fue González Malavé —*con una mochila del tipo que usan los estudiantes para cargar libros*— luego Darío Rosado y más tarde Soto Arriví. Los vigilaron y siguieron desde que abordaron un vehículo en la plaza de Río Piedras hasta que se bajaron cerca del Tribunal Superior en Ponce. Méndez transmitía información por radio, pero no recibía respuesta. E.N.P., págs. 23–25 y 44–45. Después de caminar un tramo, los jóvenes hicieron una señal al vehículo público conducido por Julio Ortiz Molina. Por el lado del pasajero, Darío Rosado le apuntó con un arma corta y le dijo que era un asalto, abrió la puerta y entró al vehículo. E.N.P., págs. 25 y 52. Soto Arriví se montó en el asiento trasero y encañonó a Ortiz Molina por el cuello. E.N.P., págs. 25 y 52. González Malavé, armado, lo empujó y le dijo "necesitamos este carro", "échese para allá, no haga nada, ni se ponga listo porque si tenemos que liquidarlo, lo liquidamos". E.N.P., págs. 35, 46 y 53. Los agentes Cruz y Méndez observaban como a 150 ó 200 metros, y cuando este último trató de intervenir, Cruz lo detuvo informándole "que esta gente deben o tienen que llegar". E.N.P., págs. 25 y 46. Continuaron siguiéndolos hasta llegar al área de Toro Negro. E.N.P., págs. 25–26 y 46. Du-

---

[3] Ese mismo día estaba pautada la tradicional parada del Día de la Constitución en el Centro Comercial Santa Rosa, Bayamón. Asencio Moringlane, técnico de comunicaciones de la Policía, llevó e instaló allí un "van" de comunicaciones, cerca del templete. Consistía en un centro móvil de cuatro (4) radios. El Director de Comunicaciones, Calderón, le había instruido que instalara una frecuencia de radio con Ponce "porque algo iba a suceder allí". E.N.P., pág. 196. El entonces Superintendente de la Policía, Torres González, y Desiderio Cartagena, hicieron varios viajes juntos desde el templete hasta dicho "van". E.N.P., pág. 212.

rante tal seguimiento, y a través de una comunicación que provenía de Ponce, se escucharon las transmisiones por la radio del retén del Cuartel de Jayuya, osí como por los auto-patrullas de ese distrito. E.N.P., págs. 65, 68, 70 y 71.

También esa mañana, Pérez Casillas, Quiles, Montañez y González fueron trasladados desde el Aeropuerto de Isla Grande hasta el de Mercedita en Ponce por el piloto Ángel Luis Candelas en dos (2) viajes: en el primero Pérez Casillas y Quiles. E.N.P., págs. 2, 4 y 116. A solicitud de Pérez Casillas, sobrevolaron por aproximadamente cinco (5) minutos el área del Cerro Maravilla, Puntita y la Torre de la Policía. Abajo había personal en mamelucos de color oscuro, tipo uniformes, que hacían ademanes con las manos. E.N.P., pág. 3. En el Aeropuerto Mercedita los esperaba Cartagena Flores; después llegaron Mateo Espada y Santiago Borrero. E.N.P., págs. 7 y 302. Allí, Cartagena Flores escuchó decir a Pérez Casillas que había recibido información confidencial de que un grupo de terroristas armados peligrosos planeaban sabotear unas torres en Toro Negro. Que en el grupo venía un agente encubierto y posiblemente un rehén, y que debían hacer todo lo humanamente posible por salvarle la vida al rehén, *"pero que los individuos no podían o no debían bajar vivos del sector de Toro Negro".* E.N.P., pág. 18.

Mientras tanto, en el Aeropuerto de Isla Grande, el piloto Candelas recogió a Montañez y a González, y puso en el avión el equipo consistente de escopetas y material para encender carbón (*barbecue starters*). Durante el vuelo se comentó que iban para un área de picnic y que "había la probabilidad de que hubiera pelea y que probablemente tuvieran que arrancar cabezas". E.N.P., págs. 4 y 114.

Eventualmente, todos los agentes que estaban en el Aeropuerto Mercedita arribaron a la Torre de la Policía. El policía Quiñones Quiñones notó que había más personal que el día anterior, que se comunicaban por radiotransmisores, que tenían armas largas y vestían ropa de fatiga.

Estaban Pérez Casillas, Quiles, Cartagena, Nazario Mateo, Montañez, González, Santiago Borrero, Colón Berríos, Bruno, Torres y *el apelante Moreno Morales*. E.N.P., págs. 8, 116 y 303. Pérez Casillas los reunió y les indicó que cubrieran las facilidades; que tenía información de que ese día un grupo de izquierdistas se disponía atacar las torres allí enclavadas; que venía un agente encubierto y posiblemente traerían un rehén, probablemente un conductor de carro público; *que si esa gente llegaban allí, no podían bajar vivos* (E.N.P., págs. 303 y 116); que ya venían de camino (E.N.P., pág. 146) "y que se le diera a los terroristas un tiro o un tirito" (E.N.P., págs. 116 y 143). Posteriormente, *el apelante Moreno Morales* le comentó a Pérez Casillas que en las facilidades de Rikavisión "había un técnico y que era de los buenos". E.N.P., págs. 303 y 312. Después de esas instrucciones, Quiles sacó una fotografía de un cartapacio y se la mostró a Nazario Mateo, a Cartagena y a Santiago Borrero. La foto de González Malavé, tipo fichero, reflejaba una persona con pelo abultado, tipo afro, con una boina y una camisa tipo fatiga. E.N.P., págs. 8 y 303. Mientras se efectuaba esta reunión, llegaron unas monjas a la Torre de la Policía y se les impidió quedarse indicándoles que "estamos esperando visita". E.N.P., págs. 128 y 304.

Conforme sus propias instrucciones, Pérez Casillas, Cartagena Flores y Santiago Borrero salieron hacia el Cerro Puntita. E.N.P., págs. 8 y 304. Por su parte, Montañez y Colón (con rifles AR-15) junto a Bruno (que llevaba una escopeta calibre 12) fueron hacia las facilidades de Rikavisión. E.N.P., pág. 116. Como los vehículos de las monjas también se dirigían hacia Rikavisión, Montañez les dijo que no podían estar allí. Sor María Asunción Jiménez siguió, por lo que Montañez le gritó molesto y reiteró su orden. Cuando los agentes se bajaron del vehículo frente a Rikavisión, Sor María Asunción Jiménez decidió rápidamente irse. E.N.P., págs. 178–179.

Montañez instruyó a Torres y a Ríos Polanco de no dis-

parar desde adentro de la estructura de Rikavisión para que no fueran a herir en un fuego cruzado a los agentes que estaban afuera. E.N.P., págs. 116–117 y 147. Luego, los otros tres (3) agentes se movieron hasta cerca de la Torre de la Telefónica y se ocultaron en la vegetación a esperar. E.N.P., págs. 118 y 147. Poco después subió un segundo vehículo ocupado por un caballero, quien al ver a Montañez vestido con ropa de fatiga, chaleco a prueba de balas, radio *walkie-talkie* y un rifle AR-15, se marchó. E.N.P., págs. 118–119.

Contemporáneamente, durante el trayecto hacia el Cerro Maravilla, Ortiz Molina trató de persuadir a los jóvenes para que lo dejaran bajar. Éstos lo amenazaban y lo mandaban a callar. González Malavé conducía y tenía el arma debajo de la pierna; conocía la ruta, ya que hizo todos los virajes correctamente. E.N.P., págs. 25, 46 y 53–54. Cartagena Flores vio pasar el vehículo público por el área de estacionamiento de Puntita. E.N.P., pág. 8. Luego Cruz y Méndez llegaron y se detuvieron a conversar con Pérez Casillas. E.N.P., págs. 8, 26 y 46. Pérez Casillas y Cartagena Flores regresaron, entonces, a la Torre de la Policía (E.N.P., págs. 9 y 26), mientras Cruz y Méndez siguieron detrás del vehículo público (E.N.P., pág. 26). En el vehículo secuestrado, uno de los jóvenes se dio cuenta que habían pasado la torre, por lo que viraron y entraron al estacionamiento de Puntita. E.N.P., págs. 53–54. Cruz, al percatarse, también viró. E.N.P., pág. 26. Otra vez, uno de los jóvenes comentó que no iban por la carretera correcta, pues a las torres el carro llegaba, por lo que viraron a la ruta original. E.N.P., págs. 53–54. Igual hicieron los agentes. E.N.P., págs. 26 y 46. El joven al lado derecho de Ortiz Molina sugirió dejarlo por allí, pero González Malavé se negó porque estaban perdiendo mucho tiempo. E.N.P., pág. 54. Luego, el que iba al lado derecho dijo: "de ahora en adelante se hace lo que yo diga." E.N.P., pág. 54.

Al llegar al área de Rikavisión, estacionaron el vehículo

frente a las torres del Canal 7. E.N.P., págs. 54, 118 y 150. Los jóvenes se bajaron y se dirigieron hacia la parte posterior del vehículo donde se intercambiaron las armas. E.N.P., pág. 54. Mientras tanto, el agente Montañez activó su rifle AR-15 en forma silenciosa para evitar el menor ruido posible. E.N.P., págs. 119 y 151. Salió al frente, con Colón y Bruno detrás, y se acercaron al vehículo agachados con sus armas largas en posición de disparar, sin que los jóvenes se percataran. E.N.P., págs. 119 y 54. Montañez reconoció a Darío Rosado, quien tenía una careta de esquiar en la cabeza hasta la frente y unas gafas con montura oscura; González Malavé tenía guantes puestos. E.N.P., págs. 118–119 y 127–128.

Ortiz Molina se acostó en el asiento para protegerse (E.N.P., pág. 54); Montañez les dio el alto y se identificó como Policía (E.N.P., pág. 119). Los primeros disparos surgieron detrás del vehículo. E.N.P., pág. 54. Darío Rosado, que estaba más cerca de Montañez, disparó y dicho agente también les disparó. E.N.P., págs. 119–120 y 151–152. En ese momento comenzó un tiroteo simultáneo. E.N.P., pág. 54.

Las personas buscaron refugio en los arbustos y Montañez se lanzó de bruces al terreno e hizo varios disparos hacia el lateral del vehículo. E.N.P., págs. 120 y 151–153. Acto seguido, una voz gritó: "no me tiren, que soy agente"; "estoy herido". E.N.P., págs. 54, 122 y 156. Otra voz dijo: "Auxilio, me rindo." E.N.P., pág. 54. Desde los arbustos donde estaban los jóvenes salieron por el aire dos (2) armas tiradas. E.N.P., págs. 120–121 y 153. En ese momento se calmó el tiroteo. E.N.P., pág. 54.

Montañez les ordenó que salieran de donde estaban ocultos con las manos en alto. Salieron Darío Rosado y Soto Arriví. Mientras caminaban, el agente Bruno les disparó sobre la cabeza para amedrentarlos. E.N.P., págs. 121 y 153–154. Se les ordenó y se acostaron en el piso, boca abajo, con los brazos abiertos en forma de cruz. E.N.P.,

págs. 121 y 154. Montañez dejó a Bruno vigilándolos. E.N.P., pág. 121. Luego de ese arresto, no había ningún peligro a la seguridad del personal. E.N.P., pág. 173.

Entonces, Montañez y Colón fueron y encontraron a Ortiz Molina acostado en el asiento o en el piso del auto. E.N.P., págs. 121 y 155. Uno de ellos le ordenó salir, y al Ortiz Molina indicarle que era una víctima le dijo: "sal de ahí o te acribillo ahí mismo." E.N.P., págs. 54–55. Luego de salir, Colón le lanzó violentamente con la culata del rifle golpeándolo en una mano. E.N.P., págs. 55, 121, 155 y 185. Montañez lo empujó y Ortiz Molina cayó al piso, al lado de los jóvenes. E.N.P., págs. 55, 121 y 155. Montañez dejó al chofer público a cargo de Colón y fue a atender a González Malavé. E.N.P., págs. 122 y 156–157. Los agentes patearon a Ortiz Molina y uno de los jóvenes les dijo que era inocente y que por favor no le hicieran daño, que no tenía nada que ver con lo ocurrido. E.N.P., págs. 55 y 185.

Al ver a González Malavé, Montañez pensó que estaba gravemente herido y salió corriendo en busca de ayuda para llevarlo al hospital. E.N.P., págs. 122 y 157.

Cuando Cruz escuchó las detonaciones de distintas armas de fuego aceleró la marcha del vehículo. E.N.P., págs. 27 y 46. Quiñones Quiñones, que se encontraba trepado en la Torre de la Policía, le gritó y avisó al personal que estaba allí. E.N.P., pág. 184. Todos los presentes, incluyendo a Pérez Casillas y *al apelante Moreno Morales*, salieron en vehículos hacia allá. E.N.P., págs. 9 y 184.

Llegaron como diez (10) agentes a Rikavisión (E.N.P., pág. 123) y encontraron a Montañez corriendo con un arma larga, exaltado y nervioso; les comunicó que hirió al confidente: "me equivoqué, metí la pata." E.N.P., págs. 9, 27 y 47. Le informó a Pérez Casillas lo sucedido y juntos subieron a la parte alta de Rikavisión. E.N.P., págs. 122 y 157. Pérez Casillas le puso unas esposas a Soto Arriví (E.N.P., pág. 122); blasfemó a Dios y dijo "que eso no era lo que él les había dicho que hicieran". E.N.P., pág. 309.

Los agentes mantenían a Darío Rosado y a Soto Arriví arrodillados o acostados en el pavimento (E.N.P., págs. 9 y 28); estaban a su alrededor, con armas largas y en posición de alerta (E.N.P., págs. 9 y 28). Se encontraban Bruno (E.N.P., págs. 28 y 124); Colón Berríos (E.N.P., págs. 28, 124 y 159); Reverón Martínez (E.N.P., págs. 28, 124 y 159); Torres Marrero (E.N.P., págs. 28, 124 y 159); Quiles (E.N.P., págs. 28 y 159), Ríos Polanco (E.N.P., págs. 47 y 124); Montañez (E.N.P., págs. 38 y 124), el apelante Moreno Morales, (E.N.P., págs. 47 y 124); Méndez (E.N.P., págs. 124 y 159); Mateo Espada (E.N.P., págs. 124, 159 y 309); González (E.N.P., págs. 124 y 159), y Pérez Casillas (E.N.P., págs. 124 y 159).

Darío Rosado le indicó a Montañez que quería ser confidente de la Policía y éste, indignado, le propinó una patada en la cara. E.N.P., págs. 124, 161 y 169. Le iba también a pegar a Darío Rosado con algo y González le sugirió la mitad de un saco de cemento endurecido que había allí. E.N.P., págs. 124, 125 y 163. *Entonces, el apelante Moreno Morales lo levantó para descargarlo sobre la cabeza de Soto Arriví, pero se lo impidieron.* E.N.P., págs. 125, 162 y 176–177. Mientras ocurrían los insultos y las agresiones, los jóvenes no representaban ningún peligro para la seguridad de los agentes, pues estaban desarmados y uno esposado; además, la contextura física de ellos no igualaba a la de los agentes. E.N.P., pág. 124. Los jóvenes no contestaron las palabras obscenas. E.N.P., págs. 9–10 y 124.

Los ánimos de los agentes "no eran normales, estaban un poco exaltados". E.N.P., pág. 15. "Había un descontrol total", como una "histeria o locura colectiva" (E.N.P., págs. 47, 50 y 124), consistente en que "todo el mundo participaba en las agresiones y palabras que se estaban diciendo" (E.N.P., págs. 52 y 124); en que se les dieron patadas; *en que el apelante Moreno Morales intentó atacar a los jóvenes con un objeto, y que les dispararon* (E.N.P., págs. 50 y 52).

276

Ni Pérez Casillas ni ningún otro agente lo impidieron. E.N.P., págs. 124–125.

Coetáneamente, Quiles y Cruz salieron hacia el hospital con González Malavé. E.N.P., págs. 9, 28, 47, 123 y 159. Todavía los jóvenes estaban acostados boca abajo, vivos y hablando; Soto Arriví estaba esposado. E.N.P., págs. 9–10, 28, 161 y 123. Al llegar al Centro de Salud de Jayuya, González Malavé, aunque consciente, estaba pálido y tenía golpes en las manos. E.N.P., pág. 190. Presentaba una herida en el quinto dedo de la mano derecha que hacía que el dedo colgara. Además, tenía algunos orificios en el costado derecho. Sus signos vitales eran normales; no estaba en estado crítico. Se mantuvo de pie todo el tiempo. E.N.P., págs. 192–193. Quiles le indicó al Dr. José Ramos Rivera que había sido herido en un tiroteo entre la Policía y unas personas, y que había otra persona herida. E.N.P., pág. 193. A petición de González Malavé, el doctor Ramos Rivera le recetó demerol para el dolor y luego lo refirió al Hospital de Distrito de Ponce. E.N.P., págs. 190 y 193.

Paralelamente, Cartagena Flores recibió órdenes de sacar del lugar a Ortiz Molina y llevarlo a la Torre de la Policía. E.N.P., pág. 9. Cuando Ortiz Molina salió, continuaban dándole golpes a los jóvenes que estaban vivos. E.N.P., págs. 55 y 56. En la Torre de la Policía, el policía Quiñones Quiñones le preguntó a Cartagena Flores qué ocurría y éste, con el dedo índice, le comunicó que se callara. E.N.P., pág. 184. Quiñones Quiñones preguntó si había algún policía herido, a lo que Cartagena Flores contestó en la afirmativa, *y que había dos (2) muertos.* E.N.P., pág. 184. Ante ello, Ortiz Molina intervino y le dijo a Quiñones Quiñones: "no, no, los muchachos están vivos, que muchas patadas le han dado a esos muchachos." Le dijo, además, que tenían a uno agarrado por el cuello y otra persona lo apuntaba con un rifle a la vez que le decía: "hijo de la gran puta, tú no querías matar un guardia," y le decían también "acribíllalo, acribíllalo". E.N.P., pág. 184.

Luego, Cartagena Flores se marchó y regresó a Rikavisión. E.N.P., págs. 10 y 184. Ese mismo día Ortiz Molina contó lo sucedido a Félix· Santiago Torres, agente del N.I.C. de Ponce. E.N.P., pág. 206.

Cuando Cartagena Flores regresó a Rikavisión, todo se veía normal. E.N.P., pág. 16. Los jóvenes continuaban arrodillados y los agentes, *el apelante Moreno Morales*, Reverón, Bruno y Torres les apuntaban en posición de disparar. E.N.P., pág. 10. Los dos (2) jóvenes estaban vivos y hablando. E.N.P., pág. 10. González le dijo a Reverón "tírale" y "el le tiró con una escopeta y le disparó a Darío Rosado" (E.N.P., págs. 10–11, 48 y 128), quien estaba con una de las rodillas en el piso (E.N.P., págs. 48, 222, 282, 283 y 286), y no tenía armas (E.N.P., págs. 124 y 128). Luego le quitaron las esposas a Soto Arriví (E.N.P., págs. 125–126) y el agente Torres Marrero le disparó con un revólver (E.N.P., pág. 48), pero no lo mató (E.N.P., págs. 244–245), sólo lo hirió en el muslo derecho y en la pierna izquierda (E.N.P., págs. 235–236). Después de esas heridas, Soto Arriví no podía estar en pie (E.N.P., págs. 236 y 285) y le dijo: "estoy herido nada más, tírame a la cabeza" (E.N.P., pág. 128). Al ver que Torres Marrero no se atrevía a disparar, *el apelante Moreno Morales le arrebató el arma y le disparó (E.N.P., págs. 48, 128 y 165), un tiro al pecho que le ocasionó la muerte (E.N.P., págs. 237–238)*. Como Soto Arriví levantó el brazo "tratando de esquivar" (E.N.P., págs. 48, 244 y 285), el impacto de bala le fracturó el hueso del codo (E.N.P., págs. 236 y 244). Cartagena Flores, quien se alejaba para no ver, escuchó las detonaciones y vio un movimiento de retroceso en los brazos de Reverón y de Moreno Morales. E.N.P., págs. 10–11. Quiñones Quiñones y Ortiz Molina escucharon las detonaciones. E.N.P., págs. 55 y 185. *Había transcurrido entre 10 ó 15 minutos desde que se habían llevado a González Malavé.* E.N.P., págs. 55 y 126.

Cartagena Flores le preguntó a Pérez Casillas por qué

esto había sucedido y éste le contestó: "se lo merecían; algo así, porque le estaban haciendo mucho daño a Puerto Rico." Luego le dijo: "vamos a romper la escena, llévate uno para el hospital." Cartagena Flores y *el apelante Moreno Morales* salieron con el cadáver de Soto Arriví para el hospital. E.N.P., págs. 11, 29, 126 y 164. El cadáver tenía una herida profunda en el pecho proveniente de un arma de fuego, golpes y moretones en la cara. E.N.P., págs. 29–30, 66 y 126. Durante el trayecto, Cartagena Flores le preguntó *al apelante Moreno Morales* por qué tenía que ser de esa forma y éste le dijo: "eran unos bandidos, eran malos y había que hacerlo." E.N.P., pág. 11. Al llegar a Jayuya, *el apelante Moreno Morales* le indicó falsamente a Cruz que a Soto Arriví "lo recogimos herido y murió en el camino". E.N.P., pág. 29. Uno de los agentes le brindó a la enfermera Zoraida Avilés sus nombres, pero cuando les preguntó el nombre, dirección y causa de la muerte de Soto Arriví no le contestaron. E.N.P., pág. 191. El mismo doctor Ramos Rivera lo chequeó y vio los orificios y golpes que tenía. E.N.P., pág. 190. Soto Arriví llegó muerto al Centro de Salud de Jayuya a la 1:48 P.M., esto es, treinta (30) o cuarenta (40) minutos después de González Malavé. E.N.P., págs. 191 y 193.

Luego de ocurridas las muertes, González disparó el arma que portaba Darío Rosado. E.N.P., pág. 126. Darío Rosado ya no tenía los espejuelos, y le pusieron la máscara cubriéndole el rostro (E.N.P., pág. 127), unos guantes (E.N.P., págs. 118 y 128) y un revólver que no tenía antes, a una distancia de un (1) pie de su mano izquierda (E.N.P., pág. 128). También le pusieron un gorro (E.N.P., pág. 128). Una manga de la camisa de Pérez Casillas se manchó con sangre. E.N.P., pág. 139. El agente Montañez solicitó permiso de Pérez Casillas para que lo sacara de la escena y éste accedió. E.N.P., pág. 126. Los agentes González y Méndez se fueron antes de que llegara el Fiscal (E.N.P., pág. 48); también Pérez Casillas (E.N.P., pág. 30). Cartagena

Flores y Moreno Morales regresaron a Rikavisión cuando ya había agentes investigando. E.N.P., págs. 12 y 16.

Aproximadamente a la 1:00 P.M., el agente Santiago Torres del N.I.C. de Ponce escuchó al agente Mateo Espada enviar un mensaje radial solicitando que notificaran al Comandante, al Fiscal y a los fotógrafos que en el Cerro Maravilla había habido un tiroteo "donde habían dos personas muertas, un compañero herido y rehén a salvo". E.N.P., pág. 203. El mensaje se escuchó en la Comandancia de Ponce, desde donde le avisaron a San Juan Control y al Coronel Felipe Cortés (E.N.P., págs. 84, 86 y 209). También se escuchó en el Cuartel de Villalba (E.N.P., pág. 194), en los vehículos del N.I.C. en Coamo (E.N.P., pág. 198) y en Jayuya (E.N.P., pág. 66), y en la Torre de Puntita (E.N.P., pág. 304). Se instruyó a todas las unidades a mantenerse fuera del canal. E.N.P., pág. 66. Más tarde, la retén Daisy Torres Guzmán del Cuartel de Villalba escuchó una voz masculina que indicaba que le notificaran al Superintendente de la Policía que la misión había sido cumplida. E.N.P., pág. 195. Este último mensaje también lo escuchó el agente Félix Santiago en camino hacia el Cerro Maravilla. E.N.P., pág. 206.

Los primeros agentes investigadores en llegar al Cerro Maravilla fueron del C.I.C. de Coamo, Luis I. Marrero Santiago y Juan Sánchez. E.N.P., pág. 198. Había diez (10) o doce (12) personas. E.N.P., pág. 199. El cadáver de Darío Rosado tenía una herida bien grande en el pecho, la cara bien hinchada, con golpes y hematomas, y un revólver cerca de una mano. E.N.P., pág. 199. Tenía un gorro en forma de máscara que a veces le cubría la cara y otras se la subían para tomarle fotos. E.N.P., págs. 199 y 201. El vehículo público tenía perforaciones de bala y manchas de sangre. E.N.P., pág. 199. El agente Marrero Santiago comenzó a hacerle preguntas a los agentes que estaban allí, pero ellos se miraban entre sí, sin contestar y seguían de largo como si con ellos no fuera. E.N.P., págs. 199, 200 y

202. Posteriormente, llegaron de Ponce el agente Félix Santiago Torres, los fotógrafos Miranda y Castro, y el Fiscal Santos Nigaglioni. E.N.P., págs. 203–204 y 207. Al llegar había calma; nadie hablaba. E.N.P., pág. 204. Había de veinte (20) a veintidós (22) personas. E.N.P., pág. 207. El cadáver tenía el antifaz puesto. E.N.P., pág. 204. Notaron los golpes del cadáver y que tenía siete (7) heridas en el pecho. E.N.P., pág. 205.

Se tomaron fotos del occiso, del área y de todas las cosas que rodeaban el sitio. E.N.P., págs. 199 y 204. Marrero Santiago se fue al Centro de Salud de Jayuya y retrató el cadáver de Soto Arriví. E.N.P., págs. 199–200 y 202. En el lugar ocuparon dos (2) revólveres y una pistola super 38 (E.N.P., págs. 204–205); once (11) balas y cuarenta (40) centavos (E.N.P., pág. 205), y unos artículos que estaban "desparramados" en el asiento delantero del vehículo público: una mochila, unas cubetas de gas concentrado (material para prender carbón *barbecue*), dos (2) cajas de fósforos, trece (13) fósforos de carilla, tres esposas estilo casera, treinta y cuatro (34) balas calibre 38, un alambre de treinta (30) o cuarenta (40) pies, un (1) gorro militar, una camisa o *jacket*. E.N.P., págs. 199 y 205–207. Del cuerpo de Soto Arriví se ocupó la ropa, los tennis, las balas y una cuchilla plegadiza. E.N.P., pág. 206. También se ocupó la mochila que por la mañana tenía González Malavé. E.N.P., págs. 23–25.

En la caseta de Rikavisión había una tela metálica (*screen*) rota en la ventana del frente. E.N.P., pág. 263. Además, los tubos del portón y un vehículo Volkswagen recibieron impactos de bala. E.N.P., pág. 263. Antes de irse del lugar, el agente Ríos Polanco le dijo a Delgado y a Miguel Marte que nunca dijeran que desde la caseta se había disparado. E.N.P., pág. 263.

Darío Rosado tenía siete (7) agujeros en el tercio inferior y lado derecho del esternón compatibles con un escopetazo de perdigones de grueso calibre. E.N.P., págs. 215–217. La

localización de todas las heridas es compatible con la versión de que se encontraba sobre una de sus rodillas y quien le disparó estaba parado. E.N.P., pág. 222. Murió a consecuencia de un *shock* hipobolémico irreversible como consecuencia de una herida de escopeta doble cero. E.N.P., pág. 225. Su cadáver fue identificado por su esposa Ángela Rivera. E.N.P., pág. 197.

Soto Arriví tenía cuatro (4) heridas de arma corta de fuego (E.N.P., pág. 234); una a nivel del muslo derecho, otra en el vértigo superior cara antero interna de la pierna izquierda —las cuales no le permitirían estar en pie— y otra en la cara externa del codo derecho (E.N.P., págs. 235–236 y 244). La cuarta herida fue un tiro que le ocasionó la muerte, pues cogió el esternón, el saco pericardio, el corazón, el pulmón y salió por atrás. E.N.P., pág. 237. Luego de caer fue que recibió el último disparo. E.N.P., págs. 244–245. Murió también de un *shock* hipobolémico irreversible debido a una herida de arma de fuego. E.N.P., pág. 238. Su cadáver fue identificado por su padre Pedro Juan Soto. E.N.P., págs. 197–198.

Con posterioridad a estos hechos, a través de los años, se celebraron una serie de reuniones con el Comandante Pérez Casillas con el objetivo de "acordar lo que iban a decir porque allí surgieron unas actuaciones ilegales de la Policía" y tenían que "planificar la estrategia para ocultar la verdad". E.N.P., págs. 12–13, 31–33, 128–129, 210–211, 306–308, 312–313 y 315. Con ese propósito, desaparecieron expedientes y otra evidencia (E.N.P., págs. 72, 106–107 y 132) e indujeron o intentaron inducir a testigos a mentir (E.N.P., págs. 187–188, 202 y 263).

Es improbable que el equipo de Rikavisión sufriera daños significativos con los objetos ocupados en el Cerro Maravilla (E.N.P., págs. 317–320) o que con dichos objetos se pudiera quemar o destruir la torre de Rikavisión. E.N.P., págs. 321–324. Para colapsar la pared de un solo tubo de

esa torre, se requerirían veintiuna (21) cajas de treinta (30) libras de iremita. E.N.P., pág. 324.

## III

Con este trasfondo en mente, analicemos los errores planteados y discutidos adecuadamente por el apelante Moreno Morales.

m) Erró el Tribunal al no impartir instrucciones al jurado sobre el delito de Homicidio.

n) El veredicto de asesinato en segundo grado no está sostenido por la prueba desfilada en el juicio. Escrito de apelación, pág. 3.

Ambos señalamientos de error, relacionados entre sí, no se cometieron. Sobre el reclamo de instrucciones del delito de homicido, el apelante Moreno Morales nos dice que la prueba las exigía. Se funda exclusivamente en que el agente Montañez Ortiz declaró que antes de las muertes de Darío Rosado y Soto Arriví, allí prevalecía un estado de "histeria colectiva" (E.N.P., pág. 124), y los ánimos se caldearon (E.N.P., pág. 170) como resultado de las heridas recibidas por el agente encubierto González Malavé que hicieron creerle que las mismas habrían de causarle la muerte. También, que el agente Méndez describió "que aquello fue como una histeria o locura colectiva". E.N.P., pág. 50.[4]

---

[4] Estas expresiones deben aquilatarse en su texto integral. Montañez Ortiz expresó:

"Era contagioso lo que estaba ocurriendo. No puede situar a nadie en particular que estuviese golpeando, 'pero para mi era una histeria colectiva lo que había y todo el mundo participaba de las agresiones y las palabras que se estaban diciendo'. Entiende que los jóvenes no decían nada en ese momento excepto Darío Rosado que se dirige a él (el testigo) y le indica que él (Darío Rosado) quiere ser confidente de la Policía ...." E.N.P., pág. 124.

Méndez atestó:

"Ve a Julio Ortiz Molina en el 'dash', dentro del vehículo. Alguien que aparentemente tenía un arma larga trata de agredirlo con la misma, no puede precisar hacia que parte del cuerpo iba dirigido el golpe. Cuando lo intentan agredir ya Julio

■ Reiteramos la doctrina de que los tribunales deben comunicar al Jurado las instrucciones sobre homicidio si de la prueba surge alguna evidencia, por frágil que sea, que justifique un veredicto de homicidio. Sin embargo, ello no significa que estén obligados a ofrecerlas si la prueba no lo justifica. *Pueblo v. Cruz Correa*, 121 D.P.R. 270, 278 (1988); *Pueblo v. Torres Rodríguez*, 119 D.P.R. 730, 744 (1987); *Pueblo v. González Colón*, 110 D.P.R. 812, 820 (1981); *Pueblo v. Galarza*, 71 D.P.R. 557, 561 (1950). A fin de cuentas, permitir que subsista la práctica de transmitir instrucciones de homicidio cuando los autos están huérfanos de toda evidencia que justifique tal veredicto, equivaldría a autorizar que el Jurado imponga un castigo diferente al prescrito para el delito que de hecho se cometió. *Pueblo v. Cruz Correa*, supra; *Pueblo v. Serbiá*, 75 D.P.R. 394 (1953).[5]

■ En las modalidades de homicidio —súbita pendencia o de arrebato de cólera— el delito requiere que el autor de la muerte actúe movido por una provocación de

---

Ortiz Molina estaba fuera del vehículo.

"Observó que Cartagena Flores le dio una patada a Arnaldo Darío Rosado. A preguntas de qué otras personas había allí, el testigo contesta 'recuerde que aquello no pasa por mi mente como si fuera una película sino como un descontrol'." E.N.P., pág. 47.

"Se le pregunta si él declaró que en Rikavisión lo que allí había era un descontrol total y contestó que eso es así. A preguntas de cuál era el ambiente que permeaba allí, contestó que puede describirlo en estos momentos que aquello fue como una histeria o locura colectiva 'que provoca la situación que expliqué esta mañana'." E.N.P., pág. 50.

"El testigo aclara que lo de histeria colectiva es una percepción suya. A preguntas del Fiscal indicó además que él entiende por histeria colectiva y descontrol lo siguiente: el hecho de Cartagena tirarle una patada a Darío Rosado, Rafael Moreno venir con un objeto a atacar a Darío Rosado, Reverón disparar, Rafael Torres Marrero disparar y Rafael Moreno arrebatar un arma y disparar también." E.N.P., pág. 52.

[5] Múltiples decisiones nuestras explican la distinción entre el delito de asesinato y el de homicidio. Véanse: *Pueblo v. Rivera Alicea*, 125 D.P.R. 37 (1989); *Pueblo v. Cruz Correa*, 121 D.P.R. 270 (1988); *Pueblo v. Torres Rodríguez*, 119 D.P.R. 730 (1987); *Pueblo v. González Pagán*, 120 D.P.R. 684 (1988); *Pueblo v. González Colón*, 110 D.P.R. 812 (1981); *Pueblo v. Belmonte*, 106 D.P.R. 82 (1977); *Pueblo v. González Ruiz*, 90 D.P.R. 580 (1964); *Pueblo v. Cortés*, 79 D.P.R. 818 (1957); *Pueblo v. Galarza*, 71 D.P.R. 557, 561 (1950); *Pueblo v. Gelpí*, 63 D.P.R. 527 (1944).

tal naturaleza que lleve a una persona ordinaria de temperamento corriente, prudente y razonable, a perder su dominio y actuar bajo esos impulsos mentales. El homicidio se comete sin mediar reflexión y premeditación; sin un previo plan para matar. *Pueblo v. González Pagán*, 120 D.P.R. 684, 690 (1988); *Pueblo v. Belmonte*, 106 D.P.R. 82 (1977). En el caso que nos ocupa, debido a que el imputado era un policía, "debe esperarse un mayor grado de control de sus emociones, demostrando un alto grado de tolerancia ante las posibles afrentas de que pueda ser objeto en fluidas situaciones". *Pueblo v. Caro* González, 110 D.P.R. 518, 529 (1980). Véase, además, *Pueblo v. Rosso Vázquez*, 105 D.P.R. 905, 911 (1977).

Aquí no hay evidencia en qué avalar la tesis de instrucciones por homicido voluntario. Por el contrario, la prueba directa y circunstancial revela unos preparativos e instrucciones específicas, demostrativa de la existencia de un plan policiaco preconcebido. En varias ocasiones la Policía pudo haber arrestado a Darío Rosado y a Soto Arriví antes de que llegaran a su fatal destino y no lo hizo. E.N.P., págs. 25 y 46.

En el Aeropuerto Mercedita, en Ponce, Cartagena Flores escuchó a Pérez Casillas instruir que "los individuos no podían o no debían bajar vivos" de Toro Negro (E.N.P., pág. 8); en la reunión celebrada poco después en la Torre de la Policía —*donde estuvo presente el apelante Moreno Morales*— Pérez Casillas dio *esas instrucciones* nuevamente (E.N.P., págs. 8, 116, 146 y 803) y agregó que les dieran "un tiro o un tirito" (E.N.P., págs. 116 y 143). Tan *conciente* estaba el apelante Moreno Morales del significado de esas instrucciones, que le informó a Pérez Casillas que dentro de Rikavisión había un técnico "de los buenos" (E.N.P., págs. 303 y 312). Una vez arrestados, Pérez Casillas le puso las esposas a Soto Arriví (E.N.P., pág. 122) y blasfemó contra Dios y "dijo que eso no era lo que él les había dicho que hicieran" (E.N.P., pág. 309); Darío Rosado y Soto Arriví

se habían rendido y habían entregado sus armas (E.N.P., págs. 54, 120–121 y 154); estaban arrodillados o acostados en el pavimento con los agentes a su alrededor; éstos portaban armas largas y estaban en posición de alerta (E.N.P., págs. 9 y 28); les proferían palabras obscenas, tales como "cabrones, hijos de la gran puta" (E.N.P., págs. 9 y 123), "tú no querías matar a un guardia" (E.N.P., pág. 184), sin que aquéllos apenas hablasen algo (E.N.P., págs. 9–10 y 124); fueron pateados (E.N.P., págs. 47, 55, 124, 161 y 169), empujados (E.N.P., pág. 9) y agredidos con las culatas de los rifles (E.N.P., pág. 55); cuando alguien dijo que González Malavé estaba botando mucha sangre, otro comentó "que había que matar a estos cabrones" (E.N.P., pág. 47); uno de los agentes decía "acribíllalo, acribíllalo" (E.N.P., pág. 184); Montañez le iba a pegar a Darío Rosado con algo y González le dijo que con eso no, que allí había como la mitad de un saco de cemento endurecido (E.N.P., págs. 124–125 y 163), entonces *el apelante Moreno Morales* levantó el pedazo de cemento para descargarlo sobre la cabeza de Soto Arriví, pero se lo impidieron (E.N.P., págs. 125, 162 y 176–177).

Luego, el *apelante Moreno Morales*, con Reverón, Bruno y Torres los rodearon apuntándoles en posición de disparar (E.N.P., pág. 10); González le dijo a Reverón "tírale" y "él le tiró con una escopeta" un disparo a Darío Rosado (E.N.P., págs. 10–11, 48 y 128). Después de quitarle las esposas a Soto Arriví (E.N.P., págs. 125–126), Torres Marrero le disparó con un revólver (E.N.P., pág. 48) pero no lo mató (E.N.P., págs. 244–245), ya que lo hirió en el muslo derecho (E.N.P., pág. 235) y en el vértigo superior cara antero interna de la pierna izquierda (E.N.P., pág. 236). Así herido no podía mantenerse en pie (E.N.P., págs. 236 y 285). Soto Arriví indicó "estoy herido nada más, tírame a la cabeza". E.N.P., pág. 128. *Al ver que Torres Marrero no se atrevió a disparar, el apelante Moreno Morales le arrebató el arma y le disparó a Soto Arriví (E.N.P., págs. 48, 128 y 165) un tiro*

*al pecho que atravesó el esternón, el saco pericardio, el corazón, el pulmón y salió por atrás (E.N.P., pág. 237), el cual le ocasionó la muerte (E.N.P., pág. 238).*

Entre el momento en que se llevaron a González Malavé de Rikavisión y los disparos que ocasionaron las muertes transcurrieron entre diez (10) o quince (15) minutos (E.N.P., págs. 55 y 126); tiempo más que suficiente para un hombre común en circunstancias similares recuperar su autocontrol (*Pueblo v. Román Marrero*, 96 D.P.R. 796 (1968)), máxime un policía (*Pueblo v. Caro*, supra).

En resumen, no hay prueba que evidencie acto alguno de las víctimas capaz de generar una provocación que pudiera configurar jurídicamente una situación fáctica real de "arrebato de cólera". Ante estos hechos, no cabe el planteamiento del apelante Moreno Morales. Evidentemente, en Cerro Maravilla los policías crearon entre sí un estado de confusión e histeria colectiva sin que mediara provocación de Darío Rosado y Soto Arriví; no puede invocarse el "alegado arrebato de cólera". Todo lo contrario, la prueba demostró, más allá de duda razonable, la validez del veredicto de asesinato en segundo grado. Deliberadamente los agentes sacaron del lugar, antes de ejecutar a los jóvenes, al rehén Ortiz Molina (E.N.P., pág. 9); mientras Darío Rosado y Soto Arriví eran atacados estaban en completo estado de indefensión (E.N.P., págs. 55–56 y 184); en el momento en que ocurren sus muertes "todo se veía normal" (E.N.P., pág. 16); estaban arrodillados (E.N.P., págs. 9–10, 28, 48, 222, 235–236, 283, 285 y 286) y no tenían armas (E.N.P., págs. 124 y 128).

El Jurado aquilató y dirimió contra el apelante Moreno Morales toda la prueba que contundentemente demostró la ejecución de Soto Arriví. La intención maliciosa podía inferirse ya que aprovechó la indefensión de Soto Arriví y tomó ventaja para asesinarlo. *Pueblo v. Pantoja Aguayo*, 97 D.P.R. 236, 238 (1969). No podemos olvidar que

la intención criminal se evalúa en virtud de los hechos anteriores, concomitantes y posteriores. *Pueblo v. Torres Nieves*, 105 D.P.R. 340, 346 (1976). "Atacar con un arma a una persona desarmada es una actuación de la cual puede inferirse la intención de causar la muerte a dicha persona." *Pueblo v. Rivera Alicea*, 125 D.P.R. 37, 45 (1989).

## IV

o) La celebración de las vistas que llevó a cabo la Comisión de lo Jurídico del Senado del Estado Libre Asociado de Puerto Rico en el 1983; la exposición en la televisión que con motivo de dichas vistas televisadas tuvieron los testigos de cargo y el acusado apelante; y toda la publicidad excesiva que generaron las vistas y las opiniones de políticos le afectaron el derecho al acusado apelante Rafael Moreno Morales a que se le celebrara un juicio justo e imparcial. Escrito de apelación, pág. 3.

Reafirmamos que "la divulgación de noticias sobre un caso de interés para todo el país 'no violenta *per se* el derecho constitucional de un acusado, *sobre quien recae el peso de la prueba para demostrar afirmativa y satisfactoriamente* que las mismas fueron de tal naturaleza, impacto y exposición que le han privado de un juicio ante jurado imparcial' ". (Énfasis suplido y en el original.) *Pueblo v. Hernández Mercado*, 126 D.P.R. 427, 435–436 (1990). Véanse, además: *Pueblo v. Lebrón González*, 113 D.P.R. 81, 86 (1982); *Pueblo v. Maldonado Dipiní*, 96 D.P.R. 10, 14 (1976).

No concebimos cómo el apelante Moreno Morales pueda sostener que el juicio celebrado cinco (5) años *después* de las vistas televisadas de la Comisión de lo Jurídico del Senado infringió el debido proceso. ¿Cuántos años más debió demorarse? La selección del Jurado tomó desde el 12 hasta el 26 de enero de 1988. Se examinaron noventa y dos (92) candidatos, los cuales estuvieron sujetos a examen rigu-

roso sobre si tenían una opinión formada en torno a los sucesos del Cerro Maravilla.

■ "A fin de cuentas, la verdadera encuesta en juicios expuestos a mucha publicidad es determinar el estado mental que pudo haber imperado entre el Jurado. Lo realmente importante no es si el Jurado conoció o recuerda el caso en particular por los informes de prensa, sino que puede juzgar imparcialmente." *Pueblo v. Miranda Santiago*, 130 D.P.R. 507, 512 (1992).

## V

p) Erró el Tribunal al no declarar con lugar la moción de nuevo juicio. Escrito de apelación, pág. 3.

■ Sabido es que la concesión de un nuevo juicio es un asunto que cae en el ámbito discrecional del tribunal sentenciador; no intervendremos a menos que se demuestre un claro e inequívoco abuso de esa discreción. *Pueblo v. Prieto Maysonet*, 103 D.P.R. 102, 113 (1974); *Pueblo v. Agosto Castro*, 102 D.P.R. 441 (1974). No hay evidencia alguna en qué apoyar ese pedido. *Pueblo v. Rodríguez Vallejo*, 100 D.P.R. 426 (1972). Nuestros pronunciamientos en *Pueblo v. Pérez Casillas*, 126 D.P.R. 702 (1990), en nada le benefician.

## VI

q) Erró el Tribunal al sentenciar al acusado apelante de 22 a 30 años de presidio en forma consecutiva con cualquier otra sentencia que éste esté cumpliendo en la actualidad. Escrito de apelación, págs. 3–4.

El apelante Moreno Morales alega, en síntesis, que es acreedor a que se le aplique la Ley Núm. 100 de 4 de junio de 1980 (34 L.P.R.A. sec. 1044), por ser ésta más benigna,

en armonía con el Art. 4 del Código Penal, 33 L.P.R.A. sec. 3004. No tiene razón.

■ Las disposiciones del citado Art. 4 del Código Penal, conforme con el Art. 282 del Código Penal, 33 L.P.R.A. sec. 4626, se aplicarán con carácter prospectivo a partir de la fecha de su vigencia. *Pueblo v. Rosso Vázquez*, supra. Por su parte, la Sec. 4 de la Ley Núm. 100, *supra*, dispone:

> Esta Ley comenzará a regir nueve meses después de su aprobación, y sus disposiciones serán aplicables a personas a ser juzgadas por hechos delictivos que se *cometan a partir de la fecha de su vigencia.* (Énfasis suplido.) 34 L.P.R.A. sec. 1044 n.

En este caso, los hechos delictivos ocurrieron *antes* de la vigencia de esa ley. La pena impuesta está dentro de los límites legales y no constituye un castigo cruel e inusitado. *Pueblo v. Hernández Mercado*, supra. Su imposición descansa en la sana discreción del tribunal sentenciador. *Pueblo v. Robledo*, 127 D.P.R. 964 (1991); *Pueblo v. Pérez Zayas*, 116 D.P.R. 197 (1985).[6]

*Se dictará sentencia confirmatoria.*

Los Jueces Asociados Señores Rebollo López y Hernández Denton concurrieron con el resultado sin opinión escrita. La Juez Asociada Señora Naveira de Rodón se inhibió.

---

[6] El informe presentencia evaluó las circunstancias particulares en que se cometió el delito: víctimas indefensas, desarmadas frente a un grupo mucho mayor de policías armados; que el apelante Moreno Morales intentó golpear a Soto Arriví con un pedazo de cemento, y que encubrió el crimen.