EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAFAEL ROMÁN MARRERO, acusado y apelante.

*Número:* CR-67-189     *Resuelto:* 17 de diciembre de 1968

*Enrique Miranda Merced, E. Armstrong de Watlington* y *Julio García Antique,* abogados del apelante; *Rafael A. Rivera Cruz, Procurador General,* y *Federico Rodríguez Gelpí, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

Juzgado por el delito de Asesinato en Primer Grado, el jurado que entendió en el caso, declaró al acusado apelante culpable de Asesinato en Segundo Grado. El juez que presidió el proceso lo condenó a sufrir de 10 a 15 años de presidio. También le declaró culpable de una infracción al Art. 4 de la Ley de Armas y le sentenció a sufrir un año de cárcel.

De acuerdo con la prueba que hay en el récord, el día 18 de junio de 1963 Roberto Tirado Rodríguez y Carlos Candelario Jiménez estaban en el barrio Candelaria Arenas de Toa Baja tomando licor. Después de las diez de la noche de ese día surgió una discusión entre Carlos Candelario Jiménez y el acusado Rafael Román Marrero. El primero hizo uso de una pistola para dispararle al acusado. Haló el gatillo pero la pistola no disparó. Se separaron y el acusado se marchó. Candelario Jiménez se quedó junto a Roberto Tirado Díaz, conversando y tomando licor frente a un negocio que estaba cerrado. Como a los doce y quince minutos el acusado regresó a aquel sitio armado de un machete. Se va para la carretera con Candelario Jiménez y sostienen una discusión. Este último hace uso de la pistola y hala el gatillo dos veces pero no salen los disparos. El acusado le asesta entonces un machetazo en la frente hiriéndolo y cercenándole algunos de los dedos de la mano. La pistola cae al suelo. Aunque el único testigo presencial de los hechos no sabe si el acusado continuó atacando a Candelario Jiménez, el médico que practicó la autopsia dice que el cadáver de Candelario Jiménez presentaba múltiples heridas incisas en la cabeza, herida desde la región molar

izquierda hasta la nuca, heridas en la cara posterior del hombro izquierdo, en la cara posterior del brazo izquierdo, en la región escapular izquierda, cara posterior del antebrazo, cara posterior de los dedos tres, cuatro y cinco de la mano izquierda, cara posterior del antebrazo derecho, cara posterior del muslo izquierdo y cara posterior de la rodilla izquierda; lesión en la región frontal media con fractura de los huesos previamente de la nariz; herida en la región auricular del pabellón auricular izquierdo que divide el pabellón en dos mitades; tres heridas en la espalda.

La causa de la muerte fue la hemorragia externa y choque hemorrágico habiendo también contribuido a la muerte la fractura del cráneo y laceraciones cerebrales. La policía ocupó la pistola cerca del cadáver de Candelario Jiménez y también ocupó en la residencia del acusado el machete usado por éste.

En este recurso el apelante señala como errores (1) ciertas instrucciones trasmitidas por el juez al jurado y (2) que la prueba, a lo sumo justifica una convicción por el delito de homicidio voluntario.

La primera instrucción que ataca el apelante es la referente a la definición del delito de asesinato y a la de malicia premeditada. Arguye que el juez utilizó el texto castellano del Código Penal al definir el delito de asesinato como el acto de dar muerte ilegal a un ser humano con malicia y premeditación en vez de usar el texto inglés de dicho Código que define dicho delito como el acto de dar muerte ilegal a un ser humano con malicia premeditada. Alega que incurrió en igual error al clasificar la premeditación en expresa o tácita en vez de referirse a la malicia premeditada. Su contención es al efecto de que tales instrucciones crearon confusión en el jurado.

No creemos que tenga razón. En más de una ocasión el juez instruyó al jurado en el sentido de que para que se

cometa el delito de asesinato en segundo grado basta la malicia premeditada y si bien definió lo que se entendía por premeditación expresa o tácita, les explicó también lo que se entendía por malicia expresa y malicia tácita. De suerte que tales instrucciones no tendieron a confundir al jurado sobre lo que en derecho penal es la malicia premeditada. Véase *Pueblo* v. *Méndez*, 74 D.P.R. 913, 921 (1953).

También sostiene que es desorientadora y constituye un error perjudicial la instrucción sobre malicia tácita. Cita aisladamente aquella parte de las instrucciones en que el juez dijo: "Malicia tácita es la que la ley deduce del hecho delictivo consistente en sí mismo y cuando la muerte de una persona resulta evidente y no hay ninguna circunstancia en la prueba que tenga por objeto mitigar, excusar o justificar el acto ejecutado por el que lo causó, entonces se presume la existencia de la malicia tácita." El juez agregó: "No obstante la presunción, la existencia de malicia tácita es una cuestión de hecho a ser resuelta exclusivamente por el Jurado y si de la prueba presentada por el Ministerio Público o de la totalidad de la prueba surgen circunstancias de mitigación, excusa o justificación o si surge prueba de ausencia de intención criminal, debe descartarse la presunción teniendo el jurado derecho en todo caso a llegar a sus propias conclusiones sobre la existencia de malicia." El juez también transmitió al jurado la siguiente instrucción: "La malicia puede inferirse del uso de un arma ya que tal uso puede ir acompañado de una intención de matar o causar grave daño corporal cuya consecuencia probable sea la muerte. Ahora bien, el acusado de disparar con un arma o de esgrimir un cuchillo, un machete, puede ser impulsivo e impetuoso."

No podemos concluir con el apelante en que estas instrucciones llevaran al ánimo del jurado la creencia de que el Pueblo no viniera obligado a probar la malicia premeditada. Ya el juez había instruido al jurado en el sentido de que

cuando "el elemento de deliberación está ausente pero concurren los otros elementos de premeditación, intención específica de matar, el Asesinato es en Segundo Grado. Aun cuando podría serlo en Segundo Grado aun cuando esté ausente la intención específica de matar." Otra instrucción pertinente fue la siguiente: "En un proceso por Asesinato, el Pueblo no viene obligado a ofrecer prueba directa y específica de la malicia y premeditación, pudiendo éstas inferirse de la manera en que se usa un arma."

En el segundo señalamiento de error el apelante sostiene que es confusa y desorientadora la siguiente instrucción:

"Para reducir el delito de asesinato a homicidio a base de súbita pendencia o arrebato de cólera, la muerte debe haber ocurrido mientras el agresor o el victimario actuaba bajo la directa e inmediata influencia de tal pendencia o arrebato de cólera.

Cuando la influencia de una súbita pendencia o del arrebato de cólera ha cesado de oscurecer la mente del acusado y ha transcurrido suficiente tiempo para que la pasión haya cesado y que la razón pueda controlar la conducta del acusado, no se reduce entonces el delito de asesinato a homicidio.

La verdadera cuestión es si el período de enfriamiento, 'cooling period' ha transcurrido y si la razón ha retornado, ha vuelto a controlar la conducta del acusado. Eso no se mide por la norma o 'standard' del acusado sino por la duración del período de enfriamiento que es el tiempo que toma o le duraría a una persona razonable para calmarse, para enfriarse, para que la razón vuelva a ella. La verdadera medida es la de . . . no la del acusado sino la de una persona ordinaria, de una persona razonable." (T.E. págs. 59, 60.)

◼ Arguye el apelante que la norma para determinar el "período de enfriamiento", debe ser el período de tiempo que necesitaba el acusado para calmarse o enfriarse, y no el que necesita una persona ordinaria y razonable situada en circunstancias similares.

La instrucción, sancionada por este Tribunal en ocasiones anteriores según la reconoce el apelante, es correcta. La

doctrina sobre el "período de enfriamiento" ha sido aprobada tanto en California como por la mayoría de las cortes de los Estados Unidos.

En *People* v. *Golsh*, 219 Pac. 456, el acusado solicitó del tribunal trasmitiera al jurado esta instrucción: "El período de enfriamiento (*cooling time*) es aquella época de tiempo que se considera suficiente para que un hombre se enfríe o calme después de un conflicto y que puede variar de persona a persona de acuerdo con la constitución de su naturaleza. No se puede establecer una regla uniforme en cuanto al lapso de tiempo que debe transcurrir para que una persona se enfríe. Compete al Jurado decidir, a la luz de la evidencia, en cuanto a las condiciones de la mente de la persona al momento."

Denegada dicha instrucción, el tribunal de apelación sostuvo al tribunal sentenciador. Se dijo que aquella parte de la instrucción referente a que el período de enfriamiento puede variar de persona a persona dependiendo de su constitución no es una expresión correcta de la ley. Añadió el tribunal:

"En aquel caso [refiriéndose a *People* v. *Bush,* 65 Cal. 129] nuestra Corte Suprema ha sostenido que el período de enfriamiento (*cooling time*) es el tiempo que tomaría un hombre común, situado en circunstancias similares para enfriarse. La regla aprobada por la mayoría de nuestras cortes es la de que el período de enfriamiento no es el tiempo que tomaría un hombre ideal o el acusado sino el tiempo que tomaría el hombre promedio o una persona ordinaria y razonable bajo circunstancias similares."

Esta doctrina fue ratificada en *People* v. *Gingell,* 296 Pac. 70. Véase además, 1 Warren, *On Homicide,* § 91, pág. 446; 1 Wharton, *Criminal Law & Procedure,* § 286; 40 Am. Jur.2d § 68.

Siendo correcta la instrucción impugnada, no se cometió el segundo error.

■ En el tercer señalamiento el apelante sostiene que erró el tribunal sentenciador "al instruir al jurado que para que una persona pueda invocar la defensa propia, es necesario que la persona que solicita a su favor el beneficio de la defensa propia, no haya tenido culpa alguna en la lucha a la cual fue llevada, y en la que resultó muerta alguna otra persona; y que es necesario que la persona acusada no haya tenido ningún otro medio de eludir el ataque, excepto dando muerte a su adversario."

Las indicadas instrucciones no son erróneas. En cuanto a la falta de culpa del acusado en la contienda en que resultó muerta otra persona, véase *Pueblo* v. *Hernández Maldonado*, res. en 9 de junio de 1964, *Ref. Col. Abogados* 1964-112; 1 Warren, *On Homicide*, § 151, págs. 660 y 670. En términos generales la regla es al efecto de que una persona no puede valerse de una situación creada por ella y que la lleve a matar a otra para salvar su vida o evitar grave daño personal.

Es también una regla de la defensa propia que el que mata debe haber empleado todos los medios a su alcance, consistentes con su seguridad, para evitar que se le ocasionen daños o tener que privar de la vida a otra persona al defenderse. 1 Wharton, *Criminal Law and Procedure*, § 228; 25 Cal. Jur.2d § 282. No erró el tribunal al instruir al jurado en ese sentido.

■ No era procedente, contrario a lo que sostiene el apelante en el cuarto error, instruir al jurado sobre el duelo.

En el duelo no media la súbita pendencia o el arrebato de cólera sino que es algo deliberadamente planeado y generalmente bajo ciertas reglas formales. 2 Wharton, *Criminal Law & Procedure*, § 848; 25 Am. Jur.2d § 1. En la prueba tampoco había base para transmitir tal instrucción. *Pueblo* v. *Martínez Díaz*, 90 D.P.R. 467 (1964); *Pueblo* v. *Túa*, 84 D.P.R. 39 (1961).

■ Finalmente no podemos concurrir con el apelante en cuanto a que el delito cometido es el de homicidio voluntario.

La prueba, según la hemos reseñado, ya era suficiente para que el jurado infiriera, como lo hizo, que el apelante al dar muerte a Candelario Jiménez lo hizo con malicia premeditada. El veredicto rendido por el jurado no es, por tanto, erróneo ni contrario a la prueba y al derecho.

*Deben confirmarse las sentencias apeladas.*