ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| PUEBLO DE PUERTO RICO, Apelada, v. JHONATAN ASMAL RAMÍREZ JIMÉNEZ, Apelante. | KLAN202400119 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala Superior de San Juan. Criminal núm.: K VI2023G0013, K LA2023G0108, K LA2023G0109, K OP2023G0015. Sobre: Art. 93(a) CP, 1er. Grado (enmienda 2014); Art. 6.05 y 6.14(a) de la Ley 168-2019. |
|---|---|---|

Panel integrado por su presidente, el juez Hernández Sánchez, la jueza Romero García y la jueza Martínez Cordero.

Romero García, jueza ponente.

SENTENCIA

En San Juan, Puerto Rico, a 27 de agosto de 2024.

La controversia medular ante nuestra consideración gira en torno a la convicción del apelante por el delito de asesinato en primer grado y si el Estado pudo probar, más allá de duda razonable, la comisión de ese delito o si, por el contrario, la prueba recibida y aquilatada por la jueza adjudicadora demostró la comisión de un asesinato atenuado.

Adelantamos que, examinados los autos originales, la prueba presentada por el Estado, por conducto del Ministerio Público (incluida la transcripción de la prueba oral y los vídeos de las cámaras de seguridad del lugar del crimen), así como los argumentos escritos de las partes comparecientes, no albergamos duda alguna de que procede la confirmación de la sentencia condenatoria dictada.

I

El 9 de febrero de 2024, la parte apelante, señor Jhonatan Asmal Ramírez Jiménez (señor Ramírez[1]), presentó su escrito de apelación. En él, impugnó la *Sentencia* emitida en su contra el 10 de enero de 2024,

---

[1] Las acusaciones se refieren al apelante como **Jhonatan Ramírez Campusano**; desde la presentación del escrito de apelación, su representante legal le ha llamado **Jhonatan Asmal Ramírez Jiménez**. Se trata de la misma persona.

Número identificador

SEN2024_____

notificada en esa fecha. El Tribunal de Primera Instancia, Sala Superior de San Juan, condenó al señor Ramírez como sigue:

1. A una pena de 99 años de cárcel, en el caso K VI2023G0013, por infracción al Art. 93(a) del Código Penal[2], 33 LPRA sec. 5142(a), que tipifica el delito de **asesinato en primer grado**;

2. A una pena de 20 años de cárcel en el caso K OP2023G0015, por infracción al Art. 249(c) del Código Penal, 33 LPRA sec. 5339(c), que tipifica el delito de **poner en riesgo la seguridad o el orden público al disparar un arma de fuego en un sitio público o abierto al público**[3];

3. En el caso K LA2023G0108, a una pena de 10 años de cárcel, duplicada a 20 años, por infracción a la Ley Núm. 168-2019, intitulada *Ley de Armas de Puerto Rico de 2020* (Ley de Armas); en particular, su Art. 6.05 (**portación, transportación o uso de armas de fuego sin licencia**) y su Art. 6.01 (**agravamiento de la pena**), 25 LPRA sec. 466d y 466, respectivamente.

4. Por último, y en cuanto al caso K LA2023G0109, que imputaba una infracción al Art. 6.14(a) de la Ley de Armas, 25 LPRA sec. 466m(a) (**disparar o apuntar voluntariamente un arma de fuego**), una pena de 5 años de cárcel, duplicada a 10 años, por virtud del Art. 6.01 de la Ley de Armas, 25 LPRA sec. 466.

En su escrito de apelación, el señor Ramírez apuntó la comisión del siguiente y único error: "**Erró el Tribunal de Primera Instancia al sentenciar el [*sic*] apelante por los delitos imputados.**" (Negrillas en el original).

En síntesis, en cuanto al asesinato en primer grado, adujo que la prueba del Ministerio Público (MP) demostró la comisión del delito de asesinato atenuado, pues no se había logrado establecer que hubiera mediado reflexión o premeditación. Aduce que la prueba desfilada reflejó

---

[2] Nos referimos al Código Penal de Puerto Rico de 2012, según enmendado en el 2014 y en el 2020.

[3] El tribunal ordenó que ambas penas fueran cumplidas de forma concurrente entre ellas.

que el señor Ramírez había actuado bajo un arrebato de cólera, provocado por el occiso mismo, y dentro de un período de tiempo que no permitió que el señor Ramírez se enfriara o que su cólera disminuyera. Además, alegó que el arma de fuego utilizada por el señor Ramírez le fue provista por un tercero.

Luego de sometida y estipulada la transcripción de la prueba oral (TPO), el apelante presentó su alegato el 15 de julio de 2024.

En su alegato, el apelante se limitó a abundar sobre la distinción entre el delito de asesinato en primer grado y el asesinato atenuado. Adujo que la prueba testifical recibida por el tribunal primario reflejaba que, entre el occiso, señor Yariel Arturo Pimentel, y él había mediado una discusión previa al hecho delictivo. Aludió al testimonio del agente Wilfredo Miranda Santiago, quien testificó que, en efecto, había mediado una discusión entre la víctima y el victimario. También, aludió al testimonio de la dueña del local, en cuyas afueras sucedió el hecho delictivo, señora Marta Cabrera Payano, quien mencionó que el occiso había amenazado al apelante.

Es decir, aludiendo a **una parte de los testimonios de dos testigos de cargo**, el apelante sostiene que actuó movido por una provocación adecuada, de tal naturaleza que le llevó a perder su dominio y a actuar bajo impulsos mentales causados por cólera, pendencia o emoción violenta. Citó en su apoyo las opiniones del Tribunal Supremo de Puerto Rico en *Pueblo v. Negrón Caldero*, 157 DPR 413 (2002); *Pueblo v. Moreno Morales I*, 132 DPR 261 (1992); *Pueblo v. Rivera Alicea*, 125 DPR 37 (1989); y *Pueblo v. Cruz Correa*, 121 DPR 270 (1988).

En fin, el apelante planteó que, en esta causa, se configuraban los elementos para concluir que el delito cometido era el de asesinato atenuado y no el de asesinato en primer grado. Es decir, adujo que la muerte del occiso estuvo precedida de una provocación adecuada (un presunto puño de la víctima al apelante); que el acto delictivo lo cometió mientras se encontraba en un arrebato de cólera o pendencia súbita; y, que el delito se cometió previo a que el apelante contase con un período de

enfriamiento (*cooling-off-period*). De hecho, planteó que, entre la presunta pelea entre ambos y el disparo, solo transcurrieron 27 segundos[4].

Apuntamos, además, que el apelante aduce que él temió por su vida, pues la víctima le pegó en la cara, se retiró del lugar y regresó en actitud amenazante. En ese momento, el apelante encaró al occiso, forcejearon y "se produce el disparo"[5]. Añade que el arma de fuego utilizada por el apelante le fue suministrada por un tercero y que el disparo fue producto del forcejeo entre él y el occiso[6].

Por su parte, el Ministerio Público, por conducto de la Oficina del Procurador General, presentó su alegato en oposición el 21 de agosto de 2024. Aludiendo a todos los testimonios recibidos en sala, con especificidad de las páginas y las líneas de la TPO, sostuvo que el MP había logrado establecer, más allá de duda razonable, la culpabilidad del apelante y la comisión del delito de asesinato en primer grado. Por tanto, solicitó que confirmáramos en su totalidad la sentencia condenatoria.

Examinados los escritos de las partes comparecientes, la transcripción de la prueba oral, los vídeos de las cámaras de seguridad del lugar de los hechos, a la luz del derecho aplicable, resolvemos.

II

Los hechos por los que fue acusado el señor Ramírez ocurrieron el **sábado, 13 de mayo de 2023**; entre las 9:30 a 9:35 pm, a las afueras del negocio conocido como *La Venganza*[7], que ubica en la Ave. San Patricio, sector Puerto Nuevo de San Juan, muy cerca de un cuartel de la Policía de Puerto Rico.

Como consecuencia de esos hechos, en el que falleció el señor Yariel Arturo Pimentel (señor Pimentel u occiso), el apelante señor Ramírez fue acusado por los delitos previamente descritos. Transcurridos los

---

[4] En su alegato, el apelante no explica cómo calculó esos 27 segundos.

[5] *Véase*, alegato del apelante, a la pág. 5.

[6] *Íd.*

[7] Durante el transcurso del juicio en su fondo, algunos testigos se refirieron al negocio como *La Nueva Venganza*; se trata del mismo negocio.

procesos criminales de rigor, los cuales no son objeto de controversia, el juicio por tribunal de derecho comenzó el 5 de diciembre de 2023.

Inconforme con la sentencia condenatoria impuesta, el apelante presentó este recurso. Como parte de los procesos ante nos, el apelante presentó la transcripción de la prueba oral (TPO) el 24 de mayo de 2024. De ella surgen los testimonios vertidos en sala durante la celebración del juicio por tribunal de derecho el 5, 7, 13 y 15 de diciembre de 2023. La prueba de cargo estuvo compuesta por los testimonios del agente **Wilfredo Miranda Santiago**; el señor **Celso Trinidad Mejías**; el señor **Ariel David Pimentel González**; la señora **Marta Cabrera Payano**; el doctor **Francisco Dávila Toro** (patólogo forense); el agente **Pedro A. González Reyes**; el guardia de seguridad de *La Venganza*, señor **Leodán J. Sánchez de Jesús**; el agente **José F. González Pérez** y el sargento **Martín Ríos Morales**.

El primer testigo de cargo fue el **agente Wilfredo Miranda Santiago**. Conforme surge de su testimonio, **el sábado, 13 de mayo de 2023**, llegaron a la escena del crimen, en primer lugar, el agente Miranda y un tal agente Jiménez. Una vez entrevistó a la dueña del negocio, el agente Miranda verificó la escena y estableció un perímetro para impedir el acceso a la misma. Posteriormente, la escena fue ocupada por el Cuerpo de Investigación Criminal (CIC) de la Policía de Puerto Rico. Con su testimonio se identificó y marcó como *exhibit* 38 del Ministerio Público (MP) el informe que el agente Miranda había confeccionado[8].

También se identificó y marcó la siguiente prueba documental: *exhibit* 4 del MP: foto de *La Venganza*; *exhibit* 1, foto más cercana, que refleja la acera ensangrentada; igual, el *exhibit* 24; los *exhibits* 25, 28 y 29, que reflejan el perímetro establecido y marcado por patrullas de la Policía.

---

[8] Enfatizamos que **la prueba documental sometida en evidencia fue estipulada por las partes litigantes**; a decir, los *exhibits* 1-49. En cuanto a los exhibits 43-45 del MP, que constituyen las notas a manuscrito de las entrevistas realizadas por el agente Pedro A. González Reyes, agente investigador de la División de Homicidios del CIC de San Juan, a los señores Leodán Sánchez de Jesús, Marta Cabrera Payano y Ariel D. Pimentel González, estos no fueron estipulados, pero sí fueron admitidos en evidencia. Véase, además, la TPO, a las págs. 35-36.

Posteriormente, testificó el señor **Celso Trinidad Mejías**. Conocía al occiso, señor Yariel Arturo Pimentel, padre de un nieto del señor Trinidad. El occiso cuidaba del menor. El testimonio del señor Trinidad fue a los únicos efectos de identificar la foto del cadáver del occiso: *exhibit* 39[9].

Luego, testificó el hijo de la dueña de *La Venganza*, señor **Ariel David Pimentel González** (señor Pimentel González), quien, para la fecha de los hechos, trabajaba con ella en el negocio, atendiendo la caja registradora.

La noche del 13 de mayo de 2023, él salió del negocio a "encargar una cena"[10]. Se ubicó en la terraza, que queda justo al frente de las puertas de cristal que acceden al negocio. Al salir a la terraza, observó un forcejeo entre dos hombres; con la asistencia de otro parroquiano[11], agarró a uno de los hombres ("el de la chivita"[12]) y lo alejó hacia el lado derecho del negocio. Mientras le hablaban, el de la chivita se alejó y se movió hasta el frente de la camioneta gris oscura marca *Jeep Cherokee* perteneciente a su madre, la cual estaba estacionada frente al negocio en la Ave. San Patricio. **El de la chivita aparentaba estarse escondiendo detrás de la camioneta**[13]. **Luego, escuchó tres detonaciones y vio que el de la chivita cayó al suelo**.

Además, este testigo identificó en sala al segundo hombre involucrado en el forcejeo como el acusado, señor Ramírez. **Declaró que, mientras el de la chivita se encontraba frente a la camioneta de su madre, intentando protegerse, el acusado se movió hacia la parte de atrás de la misma camioneta**. El acusado luego se movió y coincidió con el occiso, y comenzaron otro forcejeo[14].

---

[9] *Véase*, TPO, a las págs. 51-53.

[10] *Íd.*, a la pág. 56.

[11] Más adelante en el juicio, se aclaró que ese otro parroquiano era peluquero o barbero, Miguel o Michael, quien tenía su barbería al lado de *La Venganza.*

[12] El hombre de "la chivita" se refiere a la víctima, señor Yariel Arturo Pimentel. A esos efectos, nos remitimos a los *exhibits* 20-21, que son las fotos del occiso.

[13] *Véase*, TPO, a la pág. 59-60.

[14] *Íd.*, a las págs. 62-68.

Luego de las tres detonaciones, el testigo se acercó al de la chivita, que yacía en el suelo, y notó que botaba sangre por la boca. Su madre ya se había acercado y el testigo le manifestó que el de la chivita se iba a morir, pues sangraba por la boca[15].

Posteriormente, llegó la Policía a la escena, aunque ya se habían llevado al de la chivita en un vehículo privado.

Durante su interrogatorio directo, al señor Pimentel González también se le mostró el *exhibit* 40 del MP, que constituye el vídeo de las cámaras de seguridad del negocio *La Venganza*. En particular, se le mostró aquella parte del vídeo en la que aparece el testigo. **Esta porción del vídeo corroboró su testimonio previo**[16].

En su contrainterrogatorio, el señor Pimentel González declaró que, una vez él y el parroquiano sacaron al occiso de la terraza del negocio hacia la calle, **el incidente entre el occiso y el acusado había culminado**: "estaba todo calmado"[17]; en ello, transcurrieron unos dos o tres minutos[18]. Inclusive, testificó que el occiso no estaba armado[19].

También narró que, al acusado acercarse al occiso, medió un segundo forcejeo entre ambos y, luego, escuchó las tres detonaciones. **Aclaró que el acusado fue quien se acercó al occiso, mientras este intentaba protegerse, "zafarse" del acusado e irse**[20]. Conforme al vídeo que le fue presentado, declaró que veía cómo un hombre moreno le había pasado un arma al acusado[21].

El testimonio del señor Pimentel González fue consecuente y firme, y no pudo ser impugnado por el representante legal del apelante durante su contrainterrogatorio.

---

[15] *Véase*, TPO, a la pág. 68.

[16] *Íd.*, a las págs. 74-76.

[17] *Íd.*, a las págs. 99, 101, 114 y 117.

[18] *Íd.*, a la pág. 114.

[19] *Íd.*, a la pág. 105.

[20] *Íd.*, a las págs. 118-120.

[21] *Íd.*, a las págs. 114 y 116.

El próximo testimonio fue prestado por la señora **Marta Cabrera Payano**, dueña del negocio *La Venganza*. En cuanto a los hechos acaecidos el 13 de mayo de 2023, testificó que, en cierto momento de la noche, se encontraba detrás de la barra, en la caja registradora, y escuchó que se había desarrollado una pelea. Salió hacia la terraza del negocio y hasta la acera. **Notó que ya todo estaba tranquilo**; sin embargo, vio que se había formado dos grupos de personas; unos a la derecha y otros a la izquierda. Vio a su hijo, el señor Pimentel González, que hablaba con "el barbero"[22] y otro muchacho, quien resultó ser el occiso. Preguntó a su hijo qué sucedía; este le aclaró que había mediado una pelea; no obstante, en ese momento, la **señora Cabrera testificó que todo estaba tranquilo**. Mientras inquiría a su hijo sobre lo sucedido, el occiso se movió hacia la camioneta de la señora Cabrera, estacionada frente al negocio.

Ella se le queda mirando y, "[d]e momento, se arma un corre-corre"[23]. Acto seguido, ve al apelante que venía con un arma en la mano derecha, desde la calle y hacia su camioneta, y "que viene a buscar hacia el otro muchacho, el difunto, que se está escondiendo detrás de un muchacho que está detrás de mi guagua y se está como… […] escocotao o así bajándose, ahí es que yo veo que Jhonatan levanta la mano y le echa una llave y ahí es que está la detonación, al lado mío, como a dos pies de mí"[24].

Aclaró que, luego del disparo y de que el occiso hubiera caído al suelo, **el apelante intentó cargar nuevamente la pistola, sin embargo, no lo logró y salió corriendo**[25].

---

[22] En su testimonio, el señor Pimentel González había identificado al "barbero" como la persona que le ayudó a mediar en la trifulca y a apartar al occiso del apelante.

[23] *Véase*, TPO, a las págs.149-150.

[24] *Íd.*, a las págs. 150-151; más adelante, **confrontada con la grabación de la cámara de seguridad, la testigo aclaró que el occiso se estaba escondiendo del apelante**. *Íd.*, a las págs. 173-174.

[25] *Íd.*, a las págs. 152-153.

Narró, además, que luego de recibir el disparo, el occiso intentó levantarse, pero no pudo. Ella gritaba. Luego, unos jóvenes montaron al occiso en un vehículo y se lo llevaron a Centro Médico[26].

En su testimonio, confirmó que esa noche varios parroquianos jugaban a la "carabina", que es un juego de dados. Luego de que le mencionaran que alguien le había provisto el arma al apelante, sin identificarle quién había sido, se marchó a examinar las cámaras de seguridad del negocio. En ellas, observó el juego de dados y, luego, aún alrededor de la mesa, observó cómo el occiso y el apelante se habían ido a los puños. Logró observar que, más adelante, "Ticotico" le pasó el arma al apelante[27]. No obstante, al llegar la Policía al lugar, se le exigió que desistiera de observar las cámaras de seguridad, pues vendría un perito a examinarlas y a extraer su contenido.

Con relación a "Ticotico", la señora Cabrera sí logró ver en la cámara que el apelante intentó quitarle el arma; luego, "Ticotico" se la entregó. Aclaró que "Ticotico" es el apodo de un cliente del negocio, de nombre Miguel Miguel. También, logró ver en la cámara cómo el apelante, arma en mano, corrió hacia detrás de su camioneta y luego se paró en medio de la calle[28].

Durante su interrogatorio directo, a la señora Cabrera se le mostró el vídeo de las cámaras de seguridad. En él, identificó al acusado, mientras tomaba por el cuello al occiso; esto, mientras se encontraban en la terraza del negocio, alrededor de la mesa de juego[29].

En su contrainterrogatorio, la señora Cabrera admitió que sentía animosidad hacia el apelante, pues consideraba que su acción delictiva fue la que le obligó a cerrar su negocio. No obstante, negó odiarlo[30].

---

[26] *Véase*, TPO, a las págs. 153-154.

[27] *Íd.*, a la pág. 157.

[28] *Íd.*, a las págs. 158-160; y a las págs. 175-176, y a la pág. 198.

[29] *Íd.*, a la pág. 164-165.

[30] *Íd.*, a las págs. 179-180. **Inclusive, testificó que se le imposibilitaba odiar al acusado, pues ambos provenían del mismo pueblo de la República Dominicana**. *Íd.*, a la pág. 180.

En su re directo, y mientras se le mostraba el vídeo del área de la terraza, pudo identificar que quien se abalanzó contra el occiso fue el apelante[31]. Luego, en el recontrainterrogatorio, y observando el vídeo, testificó que el apelante y el occiso, fruto del juego, gesticulaban, y que el occiso había amenazado al apelante[32].

En la continuación del juicio el 13 de diciembre de 2023, se estipuló el informe médico forense, la certificación de muerte y el informe toxicológico. Además, luego de estipuladas sus cualificaciones como perito, testificó el patólogo del Instituto de Ciencias Forenses, **doctor Francisco Javier Dávila Toro** (doctor Dávila).

Durante su testimonio, relató los hallazgos de la autopsia realizada al occiso. En lo pertinente, describió que la herida de bala ubicaba en la parte superior de la espalda, un poco hacia la derecha del cuerpo[33]. La trayectoria de la bala era de arriba hacia abajo; la bala perforó el pulmón derecho, y el lóbulo derecho del hígado. El doctor pudo recuperar el proyectil, compuesto de plomo y blindaje[34]. Culminado el examen externo e interno del cadáver, el doctor Dávila concluyó que la causa de la muerte había sido una herida de bala[35].

En esa misma fecha, 13 de diciembre de 2023, también testificó el **agente Pedro A. González Reyes**, agente investigador de la División de Homicidios de San Juan. Narró que llegó a la escena del crimen a las 11:20 u 11:25 pm. Además de la sangre en la acera, identificó 3 casquillos de bala.

En esencia, el agente González confirmó el testimonio previo de la señora Marta Cabrera. Inclusive, mencionó que ella estuvo muy cerca del occiso, por lo que pudo haber sido otra víctima del apelante[36].

---

[31] *Véase*, TPO, a las págs. 192-193.

[32] *Íd.*, a la pág. 194.

[33] *Íd.*, a la pág. 211.

[34] *Íd.*, a las págs. 212-213.

[35] *Íd.*, a la pág. 214.

[36] *Íd.*, a la pág. 224.

El agente González entrevistó esa noche a la señora Cabrera, a su hijo, al guardia de seguridad del negocio, señor Leodán Sánchez de Jesús, así como a la persona que condujo al occiso al Centro Médico. Las notas que tomó de las entrevistas realizadas, si bien no fueron estipuladas, sí fueron debidamente identificadas y admitidas en evidencia[37].

Durante su testimonio, confirmó la versión de los hechos, según fueran vertidos en sala por los demás testigos de cargo. En particular, que el primer agresor había sido el occiso y que este fue sacado del local[38]. También, mientras observaba el vídeo de la cámara de seguridad en sala, pudo identificar a "Ticotico", o Miguel I. Miguel Jiménez, con quien había intervenido previo a los hechos de esa noche[39]. Además, pudo observar que, luego de la discusión y del forcejeo entre el occiso y el apelante, ellos fueron separados; el occiso salió del área de la terraza; el apelante permaneció allí y hablaba con varias personas "un tiempo razonable"; luego, el apelante salió de la terraza, se dirigió a "Ticotico", quien se sacó de la cintura un arma y se la entregó al apelante; este último cargó la pistola y salió corriendo por detrás de la camioneta *Cherokee* y hacia el frente de la misma, donde se encontraba el occiso. Le disparó una vez; luego, lo tomó por el cuello y le disparó hacia el área de la espalda. El occiso intentó levantarse; el apelante intentó dispararle nuevamente, pero la pistola no le cargó. Finalmente, una persona se dirigió al apelante y este se marchó del lugar[40].

Durante el contrainterrogatorio realizado por la defensa al agente González no se logró impugnar su credibilidad.

---

[37] *Véase*, nota al calce núm. 8, *ante*.

[38] *Véase*, TPO, a las págs. 225, 260-266. Conforme al testimonio del agente González Reyes, según sus entrevistas y su observación de las cámaras de seguridad, la trifulca entre el occiso y el apelante se suscitó durante el juego de dados. En ese momento, el control de la mesa de juego la tenía el apelante, quien se quedó con 20 dólares que no le correspondían. El occiso se percató y, molesto, le arrebató los 20 dólares al apelante. Es en ese momento que se suscita la pelea. *Id.*, a las págs. 255-258.

[39] *Íd.*, a la pág. 248. Nos remitimos, además, a las denuncias que obran en los autos originales, que identifican al señor Miguel I. Miguel Jiménez como coacusado.

[40] *Íd.*, a las págs. 251-254.

El último día del juicio, 15 de diciembre de 2023, testificó el guardia de seguridad de *La Venganza*, señor **Leodán Sánchez de Jesús**. Testificó que trabajaba para una entidad llamada *Casper Security* y que la noche del 13 de mayo de 2023, estaba asignado a prestar seguridad en *La Venganza*.

A eso de las 9:35 pm, vio el altercado entre el occiso y el apelante. Notó que el apelante era quien se movía hacia el occiso, y este último, a su vez, se movía hacia atrás; luego, se agredieron con los puños mutuamente[41]. El señor Sánchez, junto a otros parroquianos, intentaron intervenir entre ellos y separarlos. Notó que el apelante agarró por el cuello al occiso, como intentando ahorcarlo. Finalmente, lograron separarlos y el señor Sánchez se quedó con el acusado en la terraza del negocio; el occiso ya había salido de esa área. **El señor Sánchez intentó calmar al apelante y este pareció haberse tranquilizado**[42].

Posteriormente, notó que el apelante salió de la terraza a la acera. También, pudo observar cuando una persona le pasó un arma de fuego al apelante, que este procedió a cargar. El occiso, en ese momento, se encontraba frente a la camioneta *Cherokee*.

Mientras, el señor Sánchez procedió a buscar refugio y entró al local para protegerse. Escuchó unas detonaciones; terminadas estas, volvió a salir a la terraza del negocio. No obstante, no pudo observar nada más de lo acontecido.

El segundo testigo de cargo en la continuación del juicio el 15 de diciembre de 2023, fue el **agente José F. González Pérez**, adscrito a la Unidad de Homicidios de San Juan. Identificó el *exhibit* 48, que es el croquis que el agente confeccionó sobre el lugar de los hechos, y el *Informe de Incidente* que él preparó. Además, esa noche dejó citados a la señora Marta Cabrera, a su hijo, el señor Pimentel González, y al señor Leodán Sánchez, y a otras dos personas.

---

[41] *Véase*, TPO, a las págs. 320-322.

[42] *Íd.*, a las págs. 323-324.

Luego, se dirigió al Centro Médico donde pudo observar el cadáver del occiso.

Finalmente, admitió que llegó a ver los videos de las cámaras de seguridad del negocio. **A preguntas de la defensa, contestó que, entre el primer altercado entre el occiso y el apelante y las detonaciones, había transcurrido "un tiempo bastante considerable"; acotó que habían transcurrido entre 1 a 3 minutos**[43].

El último testigo de cargo fue el **sargento Martín Ríos Morales**, adscrito a la División de Homicidios del CIC de San Juan, quien se limitó a declarar que supervisó los trabajos realizados por los agentes Pedro González y José González en la escena del crimen.

Culminado dicho testimonio, la defensa optó por no presentar prueba testifical alguna, por lo que el caso quedó sometido.

Debemos apuntar que, como parte de la prueba documental estipulada presentada en evidencia (*exhibit* 37), el MP sometió la *Certificación* emitida el 5 de septiembre de 2023, por la División de Registro de Armas y Expedición de Licencias del Departamento de Seguridad Pública, Negociado de la Policía de Puerto Rico, que acredita que el acusado no poseía licencia de armas[44].

III

A

La presunción de inocencia es uno de los derechos fundamentales que le asiste a todo acusado. Const. de P.R., Art. II, Sec. 11, 1 LPRA. Como corolario de este derecho, rige la máxima de que el Estado tiene que demostrar, con prueba suficiente y más allá de toda duda razonable, la culpabilidad de una persona que ha sido acusada de delito. Ello constituye uno de los imperativos del debido proceso de ley. *Pueblo v. Irizarry,* 156 DPR 780, 786 (2002).

---

[43] *Véase*, TPO, a las págs. 355-356.

[44] Véase, *Pueblo v. Meléndez Monserrate*, op. de 19 de julio de 2024, 2024 TSPR 80, a la pág. 27. Es decir, en este caso, el MP descargó su obligación de probar, más allá de duda razonable, que el apelante carecía de una licencia de armas al momento de la comisión de los delitos imputados.

Cónsono con lo anterior, en nuestro sistema de justicia criminal, el Estado tiene la obligación de presentar suficiente evidencia sobre todos los elementos del delito y su conexión con el acusado, a fin de establecer la culpabilidad de este más allá de duda razonable. *Pueblo v. García Colón I,* 182 DPR 129, 174 (2011). Ahora bien, tal exigencia no significa que el Ministerio Público deba presentar evidencia dirigida a establecer la culpabilidad del acusado con certeza matemática. *Pueblo v. Feliciano Rodríguez*, 150 DPR 443, 447 (2000); *Pueblo v. Álvarez Granados*, 116 DPR 3, 21 (1984). Lo que se requiere es prueba suficiente, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. García Colón I*, 182 DPR, a las págs. 174-175.

Con relación a la duda razonable que acarrea la absolución del acusado, esta no puede ser una duda especulativa o imaginaria, ni cualquier duda posible. Más bien, se trata de una duda producto de una consideración justa, imparcial y serena de la totalidad de la evidencia del caso. *Pueblo v. García Colón I*, 182 DPR, a las págs. 174-175. Así pues, existirá duda razonable cuando el juzgador de los hechos sienta en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada. *Pueblo v. Casillas Díaz,* 190 DPR 398, 415 (2014).

En lo que respecta a la evaluación y suficiencia de la prueba, esta se regirá por los principios establecidos en la Regla 110 de las de Evidencia, 32 LPRA Ap. VI. En nuestro ordenamiento, las Reglas de Evidencia permiten que un hecho pueda probarse mediante evidencia directa o indirecta, o circunstancial. Conforme al inciso (h) de la mencionada Regla 110*,* la evidencia directa "es aquélla que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestre el hecho de modo concluyente".

Con relación a la prueba testifical, la Regla 601 de las de Evidencia, 32 LPRA Ap. VI, dispone lo siguiente:

> Toda persona es apta para ser testigo, salvo disposición en contrario. Una persona no podrá servir como testigo cuando,

por objeción de parte o a iniciativa propia, el Tribunal determina que ella es incapaz de expresarse en relación al asunto sobre el cual declararía, en forma tal que pueda ser entendida - bien por sí misma o mediante intérprete - o que ella es incapaz de comprender la obligación de decir la verdad que tiene una persona testigo.

De modo que la evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley. Regla 110(d) de las de Evidencia, 32 LPRA Ap. VI. Ello así, aun cuando no haya sido un testimonio perfecto. *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). Por esta razón, las contradicciones de un testigo - sean estas intrínsecas o relacionadas con otros testimonios - no conllevan necesariamente la revocación de un fallo condenatorio, a menos que produzcan en el foro apelativo una "insatisfacción o intranquilidad de conciencia tal", que estremezca su sentido básico de justicia. *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 474 (1988).

Nótese, además, que el derecho a un juicio justo no significa el derecho a un juicio perfecto. Los procedimientos judiciales son dirigidos por, y dependen de, los seres humanos, por lo que están sujetos a errores. Sin embargo, por mandato constitucional, el deber de todos es aspirar y velar porque estos procesos sean justos e imparciales. *Pueblo v. Santiago Lugo,* 134 DPR 623, 631 (1993).

Cónsono con ello, la determinación de culpabilidad de una persona es revisable en apelación, pues la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y de derecho. De igual forma, la determinación que ha hecho el juzgador de los hechos a nivel de primera instancia, a los efectos de que la culpabilidad de la persona imputada ha quedado establecida más allá de duda razonable, es revisable en apelación como cuestión de derecho. No obstante, **dado que le corresponde al jurado o, en su defecto, al juez dirimir los conflictos de prueba, los tribunales apelativos solamente intervendremos con ella cuando exista error manifiesto, pasión, prejuicio o parcialidad**. Ausentes estos errores, la determinación de culpabilidad que hace el juzgador de los

hechos resulta merecedora de una gran deferencia por parte del tribunal apelativo. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011).

La referida norma se fundamenta en el principio de que son los foros primarios los que están en mejor posición para evaluar la prueba presentada, puesto que tienen la oportunidad de observar y escuchar a los testigos. *Pueblo v. Acevedo Estrada,* 150 DPR 84, 99 (2000). Por tanto, a menos que se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto, que la apreciación de la prueba se aleje de la realidad fáctica del caso o sea inherentemente imposible o increíble, o que no exista base suficiente que apoye la determinación, el tribunal apelativo no deberá descartar arbitrariamente las determinaciones que hiciera el juzgador de primera instancia. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 63 (1991)*.*

Sin embargo, si de un análisis ponderado de la prueba desfilada ante el foro primario surge duda razonable y fundada sobre si la culpabilidad del acusado fue establecida más allá de duda razonable, el foro apelativo tiene el deber de dejar sin efecto el fallo o veredicto condenatorio. *Pueblo v. Carrasquillo Carrasquillo,* 102 DPR 545, 551 (1974).

B

El Art. 92 del Código Penal del 2012 tipifica el delito de asesinato y establece que este consiste en dar muerte a un ser humano a propósito, con conocimiento o temerariamente. 33 LPRA sec. 5141. De esta forma, el elemento mental requerido en el delito de asesinato es la intención de matar.

Ahora bien, cuando hablábamos de intención, el Art. 22 del Código Penal de 2012[45] establecía tres modalidades de intención. Sin embargo, la Ley Núm. 246-2014[46], sustituyó las modalidades de intención establecidas en el referido artículo y, en su lugar, distinguió entre cuatro estados

---

[45] 33 LPRA sec. 5035.

[46] Este estatuto supuso enmiendas significativas a la Ley Núm. 146-2012, Código Penal de Puerto Rico de 2012.

mentales: a propósito, con conocimiento, temeraria y negligentemente. En específico, el Art. 22 del Código Penal dispone ahora lo siguiente:

(1) A propósito
      (a) con relación a un resultado, una persona actúa "a propósito" cuando su objetivo consciente es la producción de dicho resultado.

      (b) con relación a una circunstancia, una persona actúa "a propósito" cuando la persona cree que la circunstancia existe.

(2) Con conocimiento
      (a) con relación a un resultado, una persona actúa "con conocimiento" cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta.

      (b) con relación a un elemento de circunstancia, una persona actúa "con conocimiento" cuando está consciente de que la existencia de la circunstancia es prácticamente segura.

(3) Temerariamente
      Una persona actúa temerariamente cuando está consciente de que su conducta genera un riesgo sustancial e injustificado de que se produzca el resultado o la circunstancia prohibida por ley.
    .     .     .     .     .     .     .     .

33 LPRA sec. 5035.

Así pues, los estados mentales de "a propósito, con conocimiento y temerariamente" sustituyen las modalidades de dolo directo de primer grado, dolo directo de segundo grado o de consecuencias necesarias y dolo eventual, respectivamente, de los incisos (a) al (c) del Art. 22 del Código de 2012, y del Art. 23 del Código de 2004[47].

Por otra parte, el Art. 93 del Código Penal de 2012, según enmendado, establece los grados de asesinato. En lo pertinente, dicho artículo especifica que se configura el delito de asesinato en primer grado cuando concurren los siguientes elementos: "Toda muerte perpetrada por medio de veneno, acecho, tortura, o a **propósito o con conocimiento**". 33 LPRA sec. 5142(a). (Énfasis nuestro).

A tenor con lo anterior, el asesinato en primer grado consistía en la deliberación previa a la resolución de llevar a cabo el hecho, luego de darle

---

[47] D. Nevares-Muñiz, *Código Penal de Puerto Rico*, San Juan, Instituto para el Desarrollo del Derecho, Inc., Ed. 2019, págs. 44-45.

alguna consideración por un período de tiempo[48]. Sin embargo, la modalidad de asesinato **a propósito** o **con conocimiento** sustituyó la modalidad de asesinato premeditado. Cónsono con lo anterior, "[m]ata a propósito quien tiene el objetivo consciente de causar la muerte de la víctima; mientras que mata con el estado mental de conocimiento quien sabe que la muerte es una consecuencia prácticamente segura de su conducta"[49].

La intención o su equivalente[50], entiéndase el estado mental de propósito o con conocimiento, constituye un elemento de hecho a ser determinado por el juzgador. En ese sentido, este deberá atender los **hechos, actos y circunstancias que rodean el evento**, que resultó en la conducta del sujeto activo. Tras su evaluación, corresponderá inferir racionalmente si hubo intención de matar o no[51].

Adicionalmente, en nuestro Código Penal el delito de asesinato se trata como un solo delito dividido en grados. Por tanto, se agrupan en la definición de asesinato todas aquellas modalidades en las que exista la intención de matar. *Pueblo v. Roche*, 195 DPR 791, 797 (2016).

Según discutido, el Art. 92 del Código Penal, 33 LPRA sec. 5141, define el asesinato como dar muerte a un ser humano a propósito, con conocimiento o temerariamente. A su vez, el Art. 22, 33 LPRA sec. 5035, define los referidos elementos subjetivos del delito y especifica que, con relación a un resultado, una persona actúa "a propósito" cuando su objetivo consciente es la producción de dicho resultado. De otra parte, establece

---

[48] En cuanto a la **deliberación previa**, el Tribunal Supremo había expresado que esta equivalía a la intención de matar, luego de alguna consideración. Sin embargo, **no importa lo rápido que el acto de matar subsiga a la formación de la intención**. *Pueblo v. Concepción Guerra*, 194 DPR 291, 305 (2015). Inclusive, de los hechos particulares de un caso puede inferirse razonablemente que **el elemento subjetivo de la malicia premeditada puede concebirse en el momento mismo del ataque**. *Pueblo v. Negrón Ayala*, 171 DPR 406, 420 (2007); *Pueblo v. López Rodríguez*, 101 DPR 897, 899 (1974).

[49] D. Nevares-Muñiz, *op. cit.*, pág. 155.

[50] En lo pertinente a este caso, el Tribunal Supremo de Puerto Rico ha expresado que: "**Atacar con un arma a una persona desarmada es una actuación de la cual puede inferirse la intención de causar la muerte a dicha persona**". *Pueblo v. Moreno Morales I*, 132 DPR 261, 287 (1992), citando de *Pueblo v. Rivera Alicea*, 125 DPR 37, 45 (1989). (Énfasis nuestro).

[51] D. Nevares-Muñiz, *op. cit.*, pág. 150.

que una persona actúa "con conocimiento" cuando es consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta. En lo pertinente, añade que, con relación a un elemento de circunstancia, una persona también actúa "con conocimiento" cuando es consciente de que la existencia de la circunstancia es prácticamente segura.

De otra parte, en su Art. 95, el Código Penal también tipifica la modalidad de **asesinato atenuado** y lo define como:

> Toda muerte causada a propósito, con conocimiento o temerariamente, que **se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia, será sancionada con pena de reclusión por un término fijo de quince (15) años.**

33 LPRA sec. 5144. (Énfasis nuestro).

Por tratarse de un asesinato, los elementos del asesinato atenuado son dar muerte a un ser humano a propósito, con conocimiento o temerariamente, pero, **a diferencia del asesinato en primer grado, en este se atenúa la pena en consideración de que la muerte es consecuencia de una súbita pendencia, o de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable**. D. Nevárez-Muñiz, *op. cit.*, págs. 161-162.

Cabe resaltar que el precitado Art. 95 fue enmendado en virtud de la Ley Núm. 246-2014, con la cual se sustituyó el antiguo concepto de "arrebato de cólera" por el de "perturbación emocional o mental suficiente". Con relación a la modalidad de asesinato atenuado provocado por una perturbación mental o emocional suficiente, la tratadista Dora Nevares-Muñiz comenta lo siguiente:

> Bajo el texto vigente en este Código **lo importante será determinar la razonabilidad de la perturbación emocional o mental suficiente ante las circunstancias del caso. La pregunta del juzgador deberá ser si hay una excusa razonable para la perturbación emocional o mental que produjo una muerte, y no si hubo una provocación adecuada o no de parte de la víctima.** La provocación, si la hubo, será un elemento, entre otros, para evaluar si existe una excusa razonable para la perturbación mental o emocional, que justifique atenuar la responsabilidad en el asesinato.

> .   .   .   .   .   .   .   .   .   .   .
>
> **Si transcurre un lapso de tiempo durante el cual la persona recobra su dominio propio, o recapacita, entonces se trata de un asesinato. La norma a aplicar para determinar si el estado de pasión se ha enfriado viene de California [*People v. Bush*, 65 Cal. 129 (1884)] y consiste en el tiempo que le tomaría a una persona común, situada en circunstancias similares, salir del estado de pasión o excitación.** *Pueblo v. Román Marrero*, 96 DPR 796 (1968)[52]. **Esta norma del período de enfriamiento permanece vigente en esta modalidad de súbita pendencia**.
>
> En cambio, la norma sobre el periodo de enfriamiento no aplica con la rigidez de arriba y debe atemperarse al texto vigente en cuanto a la modalidad en que la persona, al momento de llevar a cabo el acto que culmina en una muerte, se encuentra bajo un estado de perturbación emocional o mental para el que hay una explicación o excusa razonable**.** Se ha aceptado que una conducta influenciada por una perturbación mental o emocional suficiente podría permanecer en el sub-consciente por un tiempo y aflorar posteriormente de forma inexplicable, aun cuando parezca que los ánimos se han enfriado. Ver *People v. Casassa,* 49 N.Y. 2d 668 (1980).

D. Nevárez-Muñiz, *op. cit.*, págs. 161-162. (Énfasis y subrayado nuestros).

En cuanto a la modalidad de asesinato atenuado provocado por súbita pendencia, el Tribunal Supremo ha aclarado que no se requiere necesariamente una provocación previa, pues se trata de una pelea súbita, no reflexiva ni premeditada. *Pueblo v. Rivera Alicea*, 125 DPR 37, 46-47 (1989). Por consiguiente, para que se configure el asesinato atenuado por súbita pendencia, bastará demostrar la ocurrencia de ese tipo de pelea "a la cual se entra sin la intención previa de matar o de causar grave daño corporal". *Íd.*

Además, el Tribunal Supremo reiteró en *Pueblo v. Guadalupe Rivera*, 206 DPR 616, 634 (2021), la norma establecida en *Pueblo v. Negrón Ayala,* 171 DPR 406, 417 (2007). Sostuvo que, con relación a las frases "súbita pendencia" y "arrebato de cólera", la circunstancia atenuante

---

[52] El Tribunal Supremo de Puerto Rico adoptó el siguiente estándar:

> [E]l período de enfriamiento (*cooling time*) es el tiempo que tomaría un hombre común, situado en circunstancias similares para enfriarse. La regla aprobada por la mayoría de nuestras cortes es la de que el período de enfriamiento no es el tiempo que tomaría un hombre ideal o el acusado sino el tiempo que tomaría el hombre promedio o una persona ordinaria y razonable bajo circunstancias similares.

*Pueblo v Román Marrero*, 96 DPR 796, 801 (1968).

consistía en que el acto de la persona acusada fuere una reacción irreflexiva, pasional, **súbita e inmediata**, provocada por la víctima u otra persona actuando con esta. Lo anterior, en virtud de la definición de "homicidio" que contenía el Código Penal de 1974, 33 LPRA sec. 4004. Consignó que el homicidio presuponía que el autor de la muerte actuara movido por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar según sus impulsos mentales causados por la cólera, pendencia o emoción violenta. Finalmente, aclaró que estos principios siguen vigentes en cuanto al delito de asesinato atenuado, por este requerir una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia". *Pueblo v. Guadalupe Rivera*, 206 DPR, a la pág. 634.

IV

En su alegato, el apelante se limitó a argumentar sobre la distinción entre el delito de asesinato en primer grado y el asesinato atenuado. Adujo que la prueba testifical recibida por el tribunal primario reflejaba que, entre el occiso, señor Yariel Arturo Pimentel, y él había mediado una discusión previa al hecho delictivo. En su apoyo, solo aludió al testimonio del agente Wilfredo Miranda Santiago, quien testificó que, en efecto, había mediado una discusión entre la víctima y el victimario. También, aludió al testimonio de la dueña del local, en cuyas afueras sucedió el hecho delictivo, señora Marta Cabrera Payano, quien mencionó que el occiso había amenazado al apelante.

Es decir, aludiendo a una parte limitada de los testimonios de solo dos de los testigos de cargo, el apelante sostiene que actuó movido por una provocación adecuada, de tal naturaleza que le llevó a perder su dominio y a actuar bajo impulsos mentales causados por cólera, pendencia o emoción violenta. Nada más lejos de la verdad.

La prueba de cargo fue inexpugnable. Los testimonios fueron consecuentes y firmes, y demostraron que, si bien medió una trifulca entre

el occiso y el apelante, este último contó con suficiente tiempo para que cualquier sentido de cólera o emoción violenta aminorase.

Hemos observado los vídeos de las cámaras de seguridad de *La Venganza* y, conjuntamente con las descripciones y narraciones de los testigos de cargo, resulta evidente que el apelante contó con tiempo suficiente para tranquilizarse (inclusive, hasta conversó con varias personas). Además, vemos cómo se acerca a "Ticotico" y le pide el arma de fuego. Con ella en mano, busca al occiso, quien trataba de protegerse, y le dispara en la espalda. Intenta dispararle nuevamente, pero el arma no le funcionó.

Como bien apuntó el Estado en su alegato, la prueba desfilada por el MP estableció, más allá de duda razonable, que el apelante causó la muerte del señor Yariel Arturo Pimentel a propósito y con conocimiento. Ese acto no fue producto de una actuación irreflexiva o súbita, sino de una decisión voluntaria y consciente. El error apuntado por el apelante no se cometió.

V

Conforme a los hechos y el derecho antes expuestos, este Tribunal **confirma** en todas sus partes la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 10 de enero de 2024.

**Se ordena a Secretaría la devolución de los autos originales.**

Notifíquese.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones